**Billy HALLUM, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2006–CA–000387–MR.**

Court of Appeals of Kentucky.

March 23, 2007.

Angela Johnson, Frankfort, KY, for Appellant.

Gregory D. Stumbo, Attorney General, James C. Shackelford, Assistant Attorney General, Frankfort, KY, for Appellee.

Before COMBS, Chief Judge; MOORE and NICKELL, Judges.

## OPINION

MOORE, Judge.

Appellant Billy Hallum, Jr. appeals the Hopkins Circuit Court's judgment convicting him of first-degree possession of a controlled substance (methamphetamine), possession of marijuana, possession of drug paraphernalia, and unlawful possession of precursors to manufacture methamphetamine.[1] The trial court denied Appellant's pre-trial motion to suppress the evidence against him. A jury found Appellant guilty of the aforementioned offenses. After a careful review of the record, we affirm the Hopkins Circuit Court's judgment.

---

1. Appellant was serving five years of diversion at the time he committed the offenses upon which this case is based.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 27, 2004, Kate Finnerty, a child protective services investigator, received a referral indicating that Appellant's home was dirty, the floors were rotten, the house smelled unpleasant, his children were unsupervised and hungry, and both of the children's parents were using methamphetamine and marijuana. Due to the fact that the allegations involved methamphetamine and marijuana and because the house was in a rural area, Ms. Finnerty contacted the Hopkins County Sheriff's Department, read the referral to them, and asked that deputies accompany her and one of her co-workers to the house. Detectives Scott Troutman and Shawn Bean, and Deputy Jeremy Crick went with her.

Upon their arrival at Appellant's house, Ms. Finnerty knocked on the door, and Appellant answered. She explained to Appellant the reasons why she was there, who she was and what her role was for the Commonwealth. She also explained that she brought deputies with her because of the rural location of the residence and the allegations that had been made. Pursuant to KRS Chapter 620, Ms. Finnerty had a duty to conduct a room-by-room investigation in order to determine whether the allegations were true.

Appellant told Ms. Finnerty and the deputies to "come on in," and they did so. Appellant then closed a door to a bedroom and stood in front of it. Upon entering the house, Ms. Finnerty and the deputies were standing in the kitchen, and Ms. Finnerty walked around a corner to the living room to find Mrs. Hallum there. She also saw Appellant's three sons, the two younger of whom were eleven- and two-years old. Ms. Finnerty explained to Appellant's wife why she was there. The Hallums were angry and upset.

While Ms. Finnerty went through the home, Deputy Crick and Detective Bean went back outside the house to investigate a wire coming out of the ground into the power junction that they had noticed while initially waiting on Appellant to answer the door. However, there was no electric meter on the house. Deputy Crick and Detective Bean walked down the driveway and saw that the power cord had been spliced inside a barn and that this was the source of power for the house.

At the suppression hearing, Ms. Finnerty testified that there was a lot of garbage on the floor of the home, there were dirty dishes in the sink, and the house was messy. Additionally, she stated that the Hallums were taking electricity from another home via a spliced cord. The Hallums' home did not have its own electricity. Ms. Finnerty testified that she explained to the Hallums that, in such a situation, where there were health hazards and a child under the age of three in the home, she was required to conduct a room-by-room investigation. Ms. Finnerty was concerned about the home's condition, but she believed that the problems could be remedied.

While conducting her investigation of the home, Ms. Finnerty asked if the door that Appellant closed upon their arrival at the house was a door to another room or a door to the outside. Appellant stated that it was a door to a bedroom and a bathroom. Appellant told her that she did not need to look at that bedroom because they were only using it for storage. Ms. Finnerty again explained that she had to look through every room of the house, including that bedroom. Appellant said, "fine then, go ahead," and Ms. Finnerty entered that room.

Ms. Finnerty testified that initially she was the only person who entered the room. She stated that she found a gun hanging

on the wall in the bedroom, as well as a lot of furniture and boxes. Ms. Finnerty had recently been trained in methamphetamines detection, and while she was in the bedroom, she noticed empty boxes of Sudafed, tubings, cans, and other things that made her apprehensive. Ms. Finnerty asserted that she then asked Detective Bean to come into the room with her, and he did so. At that point, Ms. Finnerty claimed that the deputies took over the situation.

However, Detective Bean testified that he went with Ms. Finnerty into the bedroom when she initially entered that room. Detective Bean stated that he entered the room with Ms. Finnerty for her safety because he was concerned that someone may be hiding inside and harm Ms. Finnerty. Detective Bean stated that after they entered the bedroom, Ms. Finnerty pointed out empty boxes of Sudafed inside the room, as well as a suitcase. Detective Bean smelled a chemical odor that, through previous experience, he associated with the byproducts of the manufacturing of methamphetamine. At this point, the investigation became a criminal investigation.

Deputy Crick left to obtain a search warrant, while Detective Bean and Detective Troutman stayed behind to secure the residence. Detective Bean went to the kitchen to obtain a drink for one of the children, and he noticed a corner bag on the counter like some he had previously seen in places where narcotics were being manufactured.[2] He confiscated the corner bag, reasoning that it was in plain view.

Upon affidavit by Deputy Crick, the Hopkins District Court Judge issued a search warrant. While executing the search warrant, the deputies confiscated evidence including firearms, a type of hose that they had previously seen used with anhydrous tanks,[3] a plastic bag with a one-quart gas generator bottle that is typically used to manufacture methamphetamine, digital scales, starting fluid, paper towels, corner bags, coffee filters, a bag containing what they suspected to be a half-gram of methamphetamine, more than sixty-five grams of marijuana, drug paraphernalia, assorted ammunition, four lithium batteries, pseudoephedrine tablets, and empty pseudoephedrine pads.

Ultimately, Ms. Finnerty unsubstantiated most of the referral because the children were supervised, and they did not appear to be hungry. And, although the house was messy, it could be remedied. Other than the drug paraphernalia in the closed bedroom, Ms. Finnerty testified that she would have simply developed and gone over a safety plan with the Hallums concerning the condition of the home, particularly the electricity concerns that she had.

Appellant was arrested on January 28, 2004. He was indicted on the following charges: (1) possession of a controlled substance (methamphetamine); (2) possession of marijuana; (3) possession of drug paraphernalia, first offense; (4) possession of a firearm by a convicted felon; and (5) unlawful possession of precursors to manufacture methamphetamine. The fourth count against Appellant for felony firearm was ultimately bifurcated from the remaining charges, so that Appellant would be tried on that charge separately.

---

2. The parties have not explained what a "corner bag" is, but it appears to be a term of art for the type of bag used to transport illegal drugs. *See Johnson v. Commonwealth*, 105 S.W.3d 430, 433–34 (Ky.2003).

3. Again, the parties have not explained what an "anhydrous tank" is, but it appears to be a tank containing anhydrous ammonia, which is commonly used in the manufacturing of methamphetamine. *See Parks v. Commonwealth*, 192 S.W.3d 318, 322 (Ky.2006).

As for the remaining charges in this case, Appellant moved to suppress the evidence against him on the basis that the evidence was not seized pursuant to a valid search warrant. Specifically, Appellant argued that because the contraband was discovered during a search prior to obtaining a warrant, the contraband that was confiscated after obtaining the warrant constitutes "fruit of the poisonous tree," and it must be suppressed.[4]

A hearing was held in the trial court concerning Appellant's motion to suppress. The trial court found that the deputies were at Appellant's "residence for lawful purposes and in the performance of their statutory duties." The court also found that the deputies "were invited into the residence by the [D]efendant and that their actions within the residence were reasonable and thus do not constitute a valid basis for suppression of evidence." Thus, the court denied Appellant's motion to suppress.

Appellant was tried before a jury and convicted on all charges remaining in this case. The trial court noted that "[i]n lieu of the penalty phase of the trial, the Defendant pled guilty to being a Second Degree Persistent Felony Offender [PFO 2nd] and accepted a sentence of five (5) years on Count 1, 12 months on Count 2, 12 months on [C]ount 3 and five (5) years

on Count 5." All counts were ordered to run "concurrently for 5 years but enhanced to 6 years by the PFO 2nd." Finally, the trial court noted that "Count 4 of the Indictment was severed from the trial and no disposition ha[d] been reached."

On appeal, Appellant claims that the trial court erred when it denied his motion to suppress because the evidence seized was "fruit of the poisonous tree." He contends that the deputies illegally searched his house without his consent prior to obtaining the search warrant and that the warrant they obtained was void because it was based on an illegal search.

## II. STANDARD OF REVIEW

If the trial court's findings of fact are supported by substantial evidence, then they are conclusive. *See Commonwealth v. Neal,* 84 S.W.3d 920, 923 (Ky.App.2002). We conduct *de novo* review of the trial court's application of the law to the facts. *Id.* We review findings of fact for clear error, and we "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Stewart v. Commonwealth,* 44 S.W.3d 376, 380 (Ky.App.2000) (internal quotation marks and citation omitted).

## III. ANALYSIS

Pursuant to KRS. § 620.040(1)[5], once Ms. Finnerty received the referral indicat-

---

4. Appellant also asserted in his motion to suppress that the search warrant was void because it had the incorrect address listed on it. The warrant stated that the search was to be conducted at 1148 Illey Sisk Road, Nortonville, Kentucky, which was Appellant's parents' address. Appellant's address is 940 Illey Sisk Road, Nortonville, Kentucky. Therefore, Appellant contended that the search was unconstitutional because the wrong address was reflected on the warrant. However, during the suppression hearing, Detective Bean testified that he noticed that the address on the warrant was incorrect, and he called the Commonwealth's attorney concerning it before he seized any evidence,

and the Commonwealth's attorney informed him that because the Global Positioning Satellite coordinates listed on the warrant, as well as the house description, were correct, then the deputies could conduct their search of Appellant's house and seize any relevant evidence they found. Regardless, on appeal, Appellant does not challenge the warrant based on the incorrect address, so that challenge has been waived. *See Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803, 815 (Ky.2004).

5. KRS. § 620.040(1) provides, in pertinent part:
    (a) Upon receipt of a report alleging abuse or neglect by a parent, guardian, or person

ing that the Appellant's house was dirty, that the children were hungry and unsupervised, and that the parents were using methamphetamine, she was required to investigate and make a determination concerning the risk of harm to the children. The statute also required her to report the referral to the police, which she did when she called to ask them to escort her to Appellant's residence.

Upon arriving at Appellant's house, Ms. Finnerty asked if she and the deputies could come inside to discuss the allegations in the referral, and Appellant gave his consent for them to enter his house. Appellant does not dispute on appeal the fact that he gave his consent for Ms. Finnerty and the deputies to enter his house.

▉▉▉ The Fourth Amendment of the United States Constitution and Section Ten of the Kentucky Constitution protect citizens from unreasonable searches and seizures without a warrant. *See Commonwealth v. Hatcher*, 199 S.W.3d 124, 126 (Ky.2006). A search conducted without a warrant is unreasonable unless it falls within one of the few exceptions to the warrant requirement. *Id.* Such exceptions include a search conducted under exigent circumstances or a search conducted after receiving proper consent. *See Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Another exception provides that evidence found in "plain view" may be seized without a war-

rant. *Hatcher*, 199 S.W.3d at 126 (internal quotation marks and citation omitted).

▉▉▉ Consent to search is an exception to the warrant requirement. The standard for determining whether consent has been given "is one of objective reasonableness." *Commonwealth v. Fox*, 48 S.W.3d 24, 28 (Ky.2001). To determine whether consent to search is constitutional in a particular case, we review "all the surrounding circumstances." *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky.1992). Consent is not provided voluntarily if it is coerced or if it is only granted in response to an assertion of legal authority. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under these circumstances, the consent is not valid and the search is unconstitutional. *Id.*

In *Wildauer v. Frederick County*, 993 F.2d 369 (4th Cir.1993), the United States Court of Appeals for the Fourth Circuit reviewed Fourth Amendment claims brought by a foster parent against a social worker and various county police officers. In *Wildauer*, the social worker and sheriff's deputies went to Wildauer's home to have four children released from Wildauer's care. *Wildauer*, 993 F.2d at 371. Wildauer released two of the children upon the social worker's arrival at the home, but Wildauer then told the social worker that the other two children had disappeared. *Id.* Wildauer asked the social worker to come into her home to help her look for

exercising custodial control or supervision, pursuant to KRS 620.030(1) or (2), the recipient of the report shall immediately notify the cabinet or its designated representative, the local law enforcement agency or Kentucky State Police, and the Commonwealth's or county attorney of the receipt of the report unless they are the reporting source.

(b) Based upon the allegation in the report, the cabinet shall immediately make an ini-

tial determination as to the risk of harm and immediate safety of the child. Based upon the level of risk determined, the cabinet shall investigate the allegation or accept the report for an assessment of family needs and, if appropriate, may provide or make referral to any community-based services necessary to reduce risk to the child and to provide family support.

the children. *Id.* Police officers entered the house with the social worker. The children were eventually found at a neighbor's house. *Id.*

Wildauer subsequently filed a civil action against the social worker and the police officers claiming that the search of her home was unconstitutional under the Fourth Amendment. On appeal, the Fourth Circuit noted that "investigative home visits by social workers are not subject to the same scrutiny as searches in the criminal context." *Id.* at 372 (citing *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971)). The Court further stated that, after Wildauer asked the social worker to come into her home to help her look for the two missing children, "[t]he entry of the deputy sheriffs ... was not unreasonable under the circumstances." *Id.* The Fourth Circuit noted that Wildauer acknowledged that she had consented to the social worker entering her house, but it was "not clear that she objected to the entry of the sheriffs." *Id.* Regardless, because the visit was not criminal in nature, the Fourth Circuit held the police were not required to inform Wildauer that she could refuse the police officers' entry into her home for the purpose of conducting a search. *Id.*

▮ Similarly, in the present case, when Ms. Finnerty entered the closed bedroom to investigate the referral she had received, it was not unreasonable for the detective to enter the room because the visit was not criminal in nature. Thus, the detective did not need to receive Appellant's consent to enter the bedroom. Moreover, once Ms. Finnerty told Appellant that she was required to look in the bedroom, Appellant told her to go ahead and do so. He did not tell the detective that he could not go into the room with her.

▮ Regardless, even if we were to assume, *arguendo,* that it was unreasonable for the detective to enter the bedroom and that he did so without Appellant's consent, exigent circumstances were present, so the entry was nevertheless proper. When exigent circumstances are present, such as the threat of imminent injury or the imminent destruction of evidence, police are permitted to enter a home without a search warrant. *See Commonwealth v. McManus,* 107 S.W.3d 175, 177 (Ky.2003); *Hughes v. Commonwealth,* 87 S.W.3d 850, 852 (Ky.2002). Under such exigent circumstances, when the police enter to perform a warrantless safety search of the premises, the search must be limited in scope to make certain that it addresses only the exigent circumstance. *See Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

In the present case, when Ms. Finnerty and the deputies entered Appellant's house, Appellant closed the door to one bedroom. Therefore, when Ms. Finnerty informed Appellant that she was required to look in that room, and she entered the room, the detective acted reasonably when he went into the room also. Once inside the room, the detective was permitted to seize any evidence he found that was in plain view. *Id.* Nevertheless, he did not seize any such evidence, even though he saw empty Sudafed boxes, tubing, a gun, and other evidence of possible criminal activity. Rather than seize the evidence that was in plain view, as he was permitted to do, he asked another deputy to obtain a search warrant. Therefore, contrary to Appellant's claim, the detective actually went beyond what was required of him in that instance to ensure that Appellant's Fourth Amendment right was not violated.

Moreover, while securing the house as Deputy Crick obtained the search warrant, Detective Bean went to the kitchen to get

a drink for one of the children, and he noticed a corner bag on the counter which was the type he had previously seen where narcotics were being manufactured. He confiscated the bag, reasoning that it was in plain view.

■ Before evidence discovered in "plain view" may be admitted at trial, the following elements must be present:

First, the law enforcement officer must not have violated the Fourteenth Amendment [6] in arriving at the place where the evidence could be plainly viewed. Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must have a lawful right of access to the object itself. Finally, the object's incriminating character must also be immediately apparent.

*Hatcher*, 199 S.W.3d at 126 (internal quotation marks and citation omitted).

In the present case, the deputies were invited into Appellant's house, so they did not violate the Fourth Amendment by entering the house. Detective Bean went to the kitchen to get a drink for the child, so he was lawfully in the kitchen where the bag could be plainly seen. Finally, the fact that the bag was a corner bag renders its incriminating character immediately apparent. Consequently, Detective Bean properly seized the corner bag because it was in plain view, and the trial court properly admitted this evidence at trial.

Therefore, because Detective Bean acted reasonably when he entered the bedroom, the search warrant obtained by the deputies based on what was seen in the bedroom was not void. Thus, the evidence against Appellant that was seized in this case was not "fruit of the poisonous tree," and the trial court properly denied Appellant's motion to suppress.

Accordingly, the judgment of the Hopkins Circuit Court is affirmed.

ALL CONCUR.

■

---

**6.** Although in *Hatcher* the Court analyzed the actions of local law enforcement under the Fourth Amendment, we assume the Court mentioned the Fourteenth Amendment to the United States Constitution in its analysis because the Fourteenth Amendment's Due Process Clause renders the Fourth Amendment applicable to the states. *See Rainey v. Commonwealth*, 197 S.W.3d 89, 92 (Ky.2006).