RENDERED: DECEMBER 16, 2010
TO BE PUBLISHED

## Supreme Court of Kentucky

2008-SC-000965-DG

FINAL

DATE 01/06/2011

MICHAEL SHAWN PAYTON                                            APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2007-CA-001379-MR
GRAYSON CIRCUIT COURT NO. 05-CR-00216

COMMONWEALTH OF KENTUCKY                                        APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

We granted discretionary review to consider in light of controlling precedent, such as the recent United States Supreme Court's decision in *Georgia v. Randolph*,[1] the holding of the Court of Appeals affirming the trial court's denial of Michael Shawn Payton's motion to suppress evidence. Payton contends that the trial court should have granted his motion to suppress evidence of illegal drugs seized from the master bedroom of his marital residence because neither he nor his wife validly consented to a search of their entire residence. Although Kentucky courts must follow the rule in *Randolph* that an occupant's voluntary consent to a warrantless premises search is ineffective to bind the co-occupant who is physically present and who objects to

---

[1]   547 U.S. 103 (2006).

the search,[2] we conclude that *Randolph* does not affect the ruling in Payton's case because (1) he did not clearly object to the search of the marital residence and (2) his wife consented to a search of the marital home without restrictions. So we affirm the Court of Appeals.

## I. FACTUAL AND PROCEDURAL HISTORY.

The parties disagree about whether Payton or his wife, Sharon (also called Lee Ann), validly consented to a search of their home, but the other underlying facts appear to be largely undisputed and are set forth in the Court of Appeals opinion in the following manner:

> On August 25, 2005, the Cabinet for Families and Children received an anonymous telephone call at their Hardin County office alleging methamphetamine existed and was being produced in the Grayson County home of Sharon and Shawn [Payton], where two children resided. The Grayson County Cabinet for Health and Family Services received the referral from the Hardin County office and the case was assigned to Rebecca Secora. Secora then contacted Deputy Blanton of the Grayson County Sheriff's Department, and requested that he accompany her to the residence.

> On August 26, 2005, at approximately 1:30 p.m., Secora, Deputy Blanton, and another deputy went to the residence. At that time, the children were in school. When they arrived, Secora and the officers approached the front door and knocked. Sharon opened the door and observed Secora and the two deputies.

---

[2] *Id.* at 106. ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.").

Secora identified herself and stated that she had received information that there were drugs and children in the home.

The precise wording used by Deputy Blanton during his initial contact with Sharon is disputed. Secora . . . testified[3] that he [Blanton] asked Sharon "was it all right if he looked around?" At another point in the suppression hearing, Secora stated that she and the officers requested "just to come in." Deputy Blanton testified that he initially asked if he could look around but that he also informed her that the police "would like to search" the residence. It is not disputed that, in response, Sharon threw her hands in the air, opened the door, and said, "Come on in."

Upon entering the house, there were no illegal drugs or contraband in plain view. Deputy Blanton then proceeded to the master bedroom where he found Shawn and Jody Mercer, an acquaintance. Shawn immediately asked Deputy Blanton for a search warrant and Deputy Blanton told him that Sharon consented to the search of the residence. Shawn responded "Fine" or "Well, okay."

. . . Deputy Blanton lifted the mattress from the Payton's [sic] bed and found a foil containing methamphetamine and two straws with methamphetamine residue.[4] After finding the drugs, Deputy Blanton performed a pat-down search for weapons. In Mercer's sock, he found a syringe and, in his pocket, burnt foil. Deputy Blanton then continued his search of the residence and under a couch cushion in the living room he found a plastic box containing seven tablets of oxycontin and two hydrocodone pills. Mercer told the officers that the methamphetamine and pills belonged to him. Shawn, in the spirit of cooperation, then directed the officers to his personal "stash" of marijuana.[5]

---

3    The Court of Appeals stated that "Secora and Sharon" testified concerning what Deputy Blanton said. But from our review of the suppression hearing, which was conducted on June 20, 2006, Sharon did not testify. Only Deputy Blanton and Secora testified. The Commonwealth says in its brief to this Court that neither Payton nor Sharon testified at the suppression hearing. Any apparent mistake in the Court of Appeals' statement that Sharon testified notwithstanding, the Court of Appeals correctly related the substance of Secora's testimony.

4    The Court of Appeals begins the sentence concerning the officer's lifting the mattress with the clause "[c]onsent given." But we have deleted the "consent given" clause because we quote the Court of Appeals in our discussion of the facts only for the purpose of stating the generally undisputed underlying facts, and we independently examine issues of consent.

5    (Footnote omitted.)

Payton filed a pretrial motion to suppress. The trial court conducted an evidentiary hearing on that motion, at which Secora and Deputy Blanton testified. The trial court denied the motion to suppress. In its order denying the motion to suppress, the trial court found that Payton's wife had consented to Deputy Blanton's searching the marital home without restriction. The trial court also found that in response to being asked where his search warrant was, "[Deputy] Blanton responded that he did not need a warrant since [Sharon] had granted consent to search the residence" and that "Payton then said 'Well, okay.'" The trial court also concluded that "When Michael [Payton] asked Blanton if he had a search warrant and was advised Lee Ann [Sharon] had waive[d] the requirement by giving her consent, Michael [Payton] indicated his consent and waiver as well by saying, 'Well, okay.'"

After the trial court denied the suppression motion, Payton entered a conditional guilty plea to the charges of first-degree, first-offense possession of a controlled substance (Methamphetamine); second-degree possession of a controlled substance (Hydrocodone); Possession of Drug Paraphernalia; and Possession of Marijuana. The trial court then entered a judgment convicting Payton of these offenses and sentencing him to a total of five years' imprisonment.

A majority of the Court of Appeals panel affirmed the trial court judgment.

## II. ANALYSIS.

### A. In Reviewing Decisions on Motions to Suppress Evidence, We Review Factual Findings for Clear Error and Questions of Application of the Law to the Facts De Novo.

As noted by the Court of Appeals majority opinion, we must apply differing standards of review to a trial court's factual findings versus its legal conclusions when reviewing a trial court's ruling on a motion to suppress. A more deferential standard of review applies to the trial court's factual findings than to its legal conclusions:

> An appellate court's standard of review of the trial court's decision on a motion to suppress requires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law.[6]

Applying these standards to this case, we conclude that the Court of Appeals correctly affirmed the trial court's ruling on the motion to dismiss. We address the factual and legal issues regarding Sharon's interaction with the authorities before addressing issues regarding Payton's interaction with the authorities because this analysis fits the chronology and context. Sharon interacted first with the authorities, and her interaction affected Payton's later interaction with the authorities.

---

[6] *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky.App. 2002) (footnotes omitted).

**B. Court of Appeals Properly Upheld Trial Court's Determination that Sharon Consented to Search of House.**

Before addressing the legal validity and effect of any consent given by Sharon, we first consider whether the trial court's factual findings concerning her interaction with the authorities are supported by substantial evidence and whether correct application of legal precedent to the facts supports a conclusion that she consented to the search.

In considering the purely factual issues, we note that there is no dispute that Sharon threw up her arms and said "come on in" in response to Secora and the officers' knock at the door and Secora's explaining to Sharon her (Secora's) purpose in being there. The only dispute concerns whether Deputy Blanton told Sharon he wanted to search the residence before Sharon said "come on in." Despite this dispute, Deputy Blanton's testimony that he told Sharon he would like to search is substantial evidence supporting the trial court's factual finding that Deputy Blanton requested Sharon's consent to search before Sharon said "come on in."

Because the trial court's factual findings on this issue are supported by substantial evidence, we next address whether the lower courts properly applied the law in determining that these factual findings support a conclusion that she consented to the search. And we conclude that the lower courts did properly apply the law. Precedent demands that courts consider whether a person consented to a search from the objective perspective of a reasonable

officer, not from the subjective perception of the person searched.[7] And in light of case law on similar facts, we believe that an officer could reasonably believe that a suspect communicated consent to search by simply stating "come on in" in response to a request to enter and search, if that person did not expressly object to a search.[8] We are satisfied that the Court of Appeals properly recognized that even though "come on in" might normally connote permission to enter without necessarily granting permission to search, stating "come on in" in response to a request to enter and search without explicitly denying or restricting consent to search could reasonably be interpreted by the officer as offering permission to search. Because (1) the trial court's factual findings are

---

[7] *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *Commonwealth v. Fox*, 48 S.W.3d 24, 28 (Ky. 2001) (following *Jimeno* and holding that scope of consent is determined by considering "what would a reasonable person have understood by the exchange between the police and the suspect."). Although *Jimeno* and *Fox* dealt explicitly with determining the "scope" of consent to search and did not explicitly address questions of whether consent to search was given at all, we believe that the scope of one's consent to search logically includes whether one has consented to search; and, thus, the question of whether one has consented to a search should likewise be determined by a standard of objective reasonableness: *i.e.* what would an officer reasonably understand from the exchange with the suspect? *See Hallum v. Commonwealth*, 219 S.W.3d 216, 221 (Ky.App. 2007), ("The standard for determining whether consent has been given 'is one of objective reasonableness.' *Commonwealth v. Fox*, 48 S.W.3d 24, 28 (Ky. 2001).").

[8] *See Jimeno*, 500 U.S. at 251 (where defendant consented to search of car in response to officer's statement that he was looking for drugs, "it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs," especially as drugs are generally carried in containers); *United States v. Coffman*, 148 F.3d 952, 953 (8th Cir. 1998) (where defendant told officers to "go ahead and look around" without express limitation, no error in trial court's determination that defendant gave "broad and unlimited" consent to search because "the typical reasonable person" would not understand that defendant was limiting consent to search).

7

supported by substantial evidence and (2) we find no error in the trial court's determination that Sharon consented to the search, even reviewing the application of law to the facts under a de novo standard, the Court of Appeals properly accepted the trial court's determination that Sharon consented to the search.[9]

## C. Court of Appeals Properly Upheld the Validity of Sharon's Consent as Voluntary.

Payton argues that even if Sharon actually or apparently consented to a search of the residence, her consent was not legally valid because it was coerced "by a show of authority and threat to custody of her children" and, thus, involuntary. We note that he does not indicate if or how he presented this specific issue to the trial court, but we will address the issue. We discern no reversible error in the trial court's not finding Sharon's consent to be involuntary, so we will not disturb the Court of Appeals' affirmation of the denial of the motion to suppress on this basis.

As Payton notes, United States Supreme Court precedent requires courts to consider the totality of the circumstances in determining whether consent is

---

[9] Payton argues that determinations that a defendant consented to a search should be subject to a de novo standard of review. But it is already clearly established that a trial court's purely factual findings (not involving application of law) are conclusive if supported by substantial evidence, although questions of application of law to the facts are subjected to a de novo standard of review. *See Neal.* Here, for instance, we believe the trial's factual finding that Deputy Blanton requested to search before Sharon told him to "come on in" is conclusive because it is supported by substantial evidence. Even applying a de novo standard of review to the trial court's determination that Sharon consented to the search, which to some degree may involve an application of law to the facts, this determination is consistent with precedent indicating that a general invitation to come in or look around without express limitation connotes a general, unlimited consent to search. *See Jimeno, Coffman.*

truly voluntary or coerced through obvious or subtle means, including whether police questions were subtly coercive and whether the consenting person was in a "possibly vulnerable subjective state."[10] Payton argues that "[t]here is nothing subtle in a situation involving police and child protective services workers showing up at your door, accusing you of having drugs in the home, and suggesting a threat to your continued custody of your children." He asserts that Sharon was "intimidated" and also intoxicated, citing Deputy Blanton's testimony that Sharon was "tore up" on drugs at the time.

Courts must determine voluntariness of consent based upon "an objective evaluation of police conduct and not by the defendant's subjective perception of reality."[11] While Sharon was apparently somewhat intoxicated and may have subjectively felt intimidated under the circumstances,[12] Payton fails to point to any evidence that Secora or the officers made any threats or promises or misrepresentations to induce Sharon's consent.[13] To be precise,

---

[10] *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).

[11] *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky. 1992), *citing Colorado v. Connelly*, 479 U.S. 157 (1986).

[12] Payton points to nothing concrete in the record to support his contention that Sharon was intimidated.

[13] *See Commonwealth v. Erickson*, 132 S.W.3d 884, 889 (Ky.App. 2004) (trial court committed no palpable error in denying motion to suppress evidence seized in consent search following traffic stop because "Erickson presented no evidence that the officers engaged in intimidating or threatening behavior or that they gave any indications that would cause a reasonable person to believe that he was constrained to consent to a search."); *Cook*, 826 S.W.2d at 331. ("A careful examination of the entire record indicates that the prosecution had established by a preponderance of the evidence that the consent given by Cook was freely and voluntarily obtained *without any threat or express or implied coercion.* . . . There is nothing in the record that shows the defendant's mental or physical condition was such that he was unable to give his permission to allow the police to obtain a blood sample. *The record does not indicate that Cook was confused or tricked* into giving

9

Secora stated the purpose of her visit was to investigate allegations of drugs in a home occupied by children; and Blanton, according to his testimony, simply stated that he would like to look around and to search. The visit took place during the middle of the day (as opposed to middle of the night[14]) when the children were at school. Payton has not claimed that weapons were drawn[15] or that Sharon was incorrectly advised of the existence of a warrant.[16] Although Deputy Blanton acknowledged that Sharon was apparently under the influence

---

his blood sample. *He was fairly apprised of what the police wanted and why they wanted it,* and the consent was freely and voluntarily given. . . . *Cook has failed to demonstrate any kind of police overreaching* which is related in any way to the consent given.) (emphasis added); *Farmer v. Commonwealth,* 6 S.W.3d 144, 146 (Ky.App. 1999) (upholding denial of motion to suppress evidence in consensual taking of blood and urine samples as in addition to being advised of *Miranda* rights, "Farmer was specifically told that he was not under arrest; and there have been no allegations that Trooper Crockett was unprofessional or abusive in his conduct."); *Krause v. Commonwealth,* 206 S.W.3d 922, 925-27 (Ky. 2006) (reversing partly because police used ruse of searching for information about rape of young girl to obtain consent to search for evidence of other offenses by exploiting suspects' desire to assist authorities in their duties while noting that not every ruse results in constitutional violation).

[14] *See Krause,* 206 S.W.3d at 926 (noting how police officers appearing at house at 4 a.m. found defendants in "particularly vulnerable state").

[15] Apparently, no published Kentucky cases specifically set forth that courts may consider whether law enforcement officers' weapons are drawn when determining whether consent to search was voluntary under the totality of the circumstances. While we decline to set forth a list of particular factors which must be considered when determining whether consent to search was voluntary, we note that other courts have permitted consideration of whether law enforcement officers' weapons are drawn as part of the totality of the circumstances affecting whether consent was voluntary. *See, e.g., Estrada v. State,* 30 S.W.3d 599, 604 (Tex.App. 2000) (trial court properly denied motion to suppress as evidence showed that consent was voluntary, considering relevant facts including fact that "[w]hile it is true that the officers were in uniform and armed, they did not remove their weapons from their holsters or engage in any show of force beyond frisking appellant . . . ."); *United States v. Betters,* 229 F.Supp.2d 1103, 1109 (D.Or. 2002) (listing possible factors for consideration in determining whether consent to search was voluntary including "whether the arresting officers had their guns drawn . . . .").

[16] *See Bumper v. North Carolina,* 391 U.S. 543, 550 (1968) (holding that consent to search was invalid where officer falsely stated that he had a warrant).

of drugs at the time, he also testified that she was not so intoxicated as to not know what she was doing.[17] And although the fact that Sharon was apparently not advised of her right to refuse consent to search, this is only one factor to be considered and is not in and of itself dispositive.[18] All in all, from our review of the evidence and relevant legal authority, we discern no error in the trial

---

[17] We note that Kentucky precedent, at least implicitly, recognizes that at least in some cases, the fact that a defendant is under the influence of alcohol or drugs does not necessarily mean that he or she is too intoxicated to be able validly to consent to a search. *See Cook*, 826 S.W.2d at 331 (affirming Court of Appeals' reversal of trial court's suppressing defendant's blood alcohol test results in vehicular homicide case due to appellate courts' conclusion that defendant voluntarily consented and noting that "[t]here is nothing in the record that shows the defendant's mental or physical condition was such that he was unable to give his permission to allow the police to obtain a blood sample."); *Farmer*, 6 S.W.3d at 146 (although apparently not presented with argument that defendant's being under influence of alcohol rendered him incapable of consenting to blood test, nevertheless upholding trial court's denial of defendant's motion to suppress blood alcohol test results in vehicular homicide case based upon voluntary consent).

While we acknowledge that Schneckloth requires consideration of whether a suspect was in a "subjectively vulnerable state" and that intoxication may put one in a subjectively vulnerable state, we cannot say that the totality of the circumstances here (including the officer's testimony that Sharon knew what she was doing despite her intoxication) mandates a conclusion that her consent was involuntary. As we read Schneckloth, evidence which suggests that one may be in a subjectively "vulnerable state," by itself, does not necessarily require a determination that one's consent was involuntary but, rather, is simply one of several factors to be considered. Further, we believe that more recent case law from both our Kentucky courts and the United States Supreme Court suggests that we must primarily focus on whether law enforcement officers' conduct was objectively coercive, rather than judging voluntariness solely based on a suspect's subjective perceptions. *See, e.g.,* Cook; Connelly, 479 U.S. at 170-71 (holding that in determining whether confession should be excluded as involuntarily given, some coercive governmental action must be shown for a confession to be properly excluded as involuntary and indicating that a defendant's subjective perception is not, by itself, dispositive).

[18] *See Schneckloth,* 412 U.S. at 232-33 ("we cannot accept the position of the Court of Appeals in this case that proof of knowledge of the right to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent. Rather it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced."). *See also id.* at 234 ("knowledge of a right to refuse is not a prerequisite of a voluntary consent.").

11

court's concluding that Sharon's consent was voluntary under the totality of the circumstances.[19]

## D. Because Payton Did Not Clearly Refuse or Revoke Consent, He is Not Entitled to Relief under *Georgia v. Randolph.*

Even if Sharon did voluntarily consent to a search of the entire residence, Payton contends that the motion to suppress should have been granted. He cites federal case law holding that implied consent by a party with an inferior interest in the residence is not effective where the suspect is present and refuses consent.[20] But we are unaware of any evidence that Sharon's interest in the marital residence was inferior to Payton's interest. In fact, the trial court held that Sharon had a superior interest because it found that Sharon was not intoxicated to the same degree as Payton.[21] Although the lower courts do not appear to have definitively stated whether Sharon's consent was express or implied, her statement "come on in" in response to the officer's reported request to look around and search could be construed as an express

---

[19] The trial court found that Sharon consented to the search, noted the "voluntary consent" of a co-tenant exception to the warrant requirement, and concluded that Sharon "gave valid consent to the search of that household, including the bedroom and its contents." Although the trial court did not explicitly find that Sharon's consent was voluntary, it does not seem unreasonable to assume that it implicitly found such consent voluntary and, in any case, it certainly did not find that her consent was involuntary.

The Court of Appeals majority discussed the necessity of finding that consent to search was voluntary and ultimately accepted that Sharon's consent was voluntary.

[20] *See United States v. Impink,* 728 F.2d 1228 (9th Cir. 1984).

[21] We need not directly address whether either member of this married couple had a superior interest to that of the other. More precisely, our holding is that Sharon validly consented to the search of the residence, having the authority to do so; and Payton did not clearly revoke Sharon's consent or clearly object to the search.

12

consent to search. And the facts do not establish that Payton clearly revoked his wife's consent or objected to the search.

Payton argues that he effectively refused or revoked consent to search by asking police "where's your warrant?" and that any apparent consent he gave by saying "fine" or "well, okay" was rendered invalid because it was offered in response to a "false claim" that Sharon consented. We first note that Payton's argument is based upon a flawed premise because we have already determined that the lower courts did not err by finding that Sharon did consent. The question then becomes whether Payton's asking "where's your warrant" but taking no other definitive action to withdraw Sharon's consent somehow means that Sharon's consent should not apply to him.

Payton cites *Georgia v. Randolph* for the proposition that a co-tenant's consent to search does not apply to a physically present co-tenant who refuses to consent. While *Georgia v. Randolph* is indisputably binding authority on our state courts, it nonetheless does not entitle Payton to relief under these facts.

We note that the trial court did not explicitly state in its conclusions of law whether Payton validly consented to the search; instead, it concluded that Sharon validly consented to the search and suggested that any concerns about the validity of any consent given by Payton were immaterial:

> It is clear that Lee Ann [Sharon] had apparent authority over the premises to authorize the search by oral consent. From the testimony at the hearing, she exhibited superior authority over Defendant Michael Payton. When Michael asked Blanton if he had a search warrant and was advised Lee Ann [Sharon] had waive[d] the requirement by giving her consent, Michael indicated his consent and waiver as well by saying, 'Well, [okay].' Michael Payton had diminished his mental capacity by getting 'tore up.'

13

> The officer was reasonable in relying on the belief that Lee Ann as an equal co-occupant/owner tenant of the residence who was in apparent control of her faculties had authority over the premises. Lee Ann gave valid consent to the search of that household, including the bedroom and its contents.

The trial court implicitly found that Payton did not refuse or revoke consent in finding that he "indicated his consent." The Court of Appeals explicitly rejected Payton's argument that he revoked the consent given by his wife and objected to the search, noting that it reviewed all his actions in context rather than solely focusing on Payton's initially questioning whether the officers had a warrant:

> Whether Shawn's initial questioning of the officers as to whether they had a search warrant prior to continuing their search was tantamount to him refusing consent to the search is not the factual situation before our Court. We cannot take Shawn's initial actions out of context. When the officers entered the room occupied by Shawn, the right of the officer's presence was challenged by Shawn's questioning the officers as to a search warrant. The response of Deputy Blanton explained their presence, *i.e.*, that Sharon had given them consent to search the residence. Of paramount importance was Shawn's response of "Fine," or "Well, okay" to Deputy Blanton's explanation. Such response is certainly consistent with both Shawn's acknowledge-ment and approval of the consent given by Sharon as well as satisfying his initial inquiry into the officer's presence in the residence. While Shawn's response may rise to the level of actual consent, it is enough that we decide that Shawn's actions did not rise to the level of an objection. *See* [*Randolph*]. Thus, Shawn neither revoked the consent given by Sharon nor objected to the search of the residence. Therefore, under the facts found by the trial court, we agree that the search of the residence passes constitutional scrutiny.

We agree with the Court of Appeals that viewing the totality of Payton's actions along with other relevant circumstances, the trial court did not err in denying the motion to suppress because Payton did not clearly revoke Sharon's consent

14

or object to the search.[22]  Although this Court recognizes the rule expressed in *Randolph,* the lack of clear revocation of consent or objection to search in this case supports the trial court's denial of the motion to suppress.

Examining *Randolph* carefully, we note that the majority opinion seemingly limits its determination that another occupant's consent to search a premises is ineffective against a physically present occupant who expressly objects to the search to "the circumstances here at issue"[23] and takes note that the defendant there clearly refused consent to search.[24]  *Randolph* is factually distinguishable from the case at hand because it appears undisputed that the defendant in *Randolph* "unequivocally refused" consent to search[25] before his estranged wife gave her consent to search.

---

[22]  Some federal cases recognize that revocation of consent must be established by "unequivocal" actions or statements. *See, e.g., United States v. Gray,* 369 F.3d 1024, 1026 (8th Cir. 2004); *United States v. Alfaro,* 935 F.2d 64, 67 (5th Cir. 1991). Although this rule may not have been previously clearly established in published Kentucky precedent, it appears consistent with Kentucky case law as cases recognizing that consent to search was withdrawn have either expressly recognized that the conduct "obviously" or "clearly" indicated withdrawal of consent, *see Bowersmith v. Commonwealth,* No. 2002-CA-000101-MR, 2003 WL 1343232 at *2 (Ky.App. Feb. 21, 2003) (reversing denial of motion to suppress as "Bowersmith's oral request that the officer not go behind his counter was a *clear revocation* of any presumed consent to search behind the desk" and "Bowersmith acted in such a *clear and obvious* way as to indicate that he was withdrawing his consent to the search.") (emphasis added), or have described clear acts of revocation of consent despite not explicitly describing the acts as clear or unequivocal. *See Fox,* 48 S.W.3d at 28 (motion to suppress properly granted where consent effectively revoked as "a reasonable person would have understood that Fox was terminating the consent to search when he closed the bag and put it in the back of the truck.").

[23]  *Randolph,* 547 U.S. at 106 ("We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.").

[24]  *Id.* at 122.

[25]  *Id.* at 107.

15

In contrast, Payton cannot be said to have "unequivocally refused" consent by his asking "where's your warrant" and then saying "fine" or "well, okay" after being told his wife had already consented to a search. And although the exact time frame is not necessarily dispositive, we also note that Payton's alleged refusal occurred after his wife apparently gave consent, whereas Randolph objected to a search even before his estranged wife gave consent to search.[26] Furthermore, to the extent that the question "where's your warrant" could be construed as an objection to a search, any such objection was quickly retracted when Payton told police "well, okay" or words to that effect when told that a warrant was not needed because his wife had already given consent. While other cases may recognize that asking "where's your warrant" may amount to refusing consent under certain circumstances,[27]

---

[26] In *Randolph*, the wife later refused to consent to a further search after an initial search she consented to yielded some incriminating evidence as to her husband. After she later withdrew consent, the police obtained a search warrant based (at least in part) on the incriminating evidence obtained during the initial search and found further incriminating evidence. *Id.* at 107-08.

[27] *See Shepard v. Davis*, 300 F.App'x. 832 (11th Cir. 2008) (construing factual allegations in light most favorable to arrestee (who brought civil rights suit against arresting officers), officers did not have arrestee's consent to enter home and arrest him where arrestee asked to see officer's warrant when they arrived at his front door and officers then entered house through front door, grabbed arrestee and pushed him onto a sofa to arrest him); *People v. Frank*, 37 Cal. Rptr. 202, 203-05 (Cal.Dist.Ct.App. 1964) (reversing trial court's denial of motion to suppress based on landlady's giving consent to search and remanding to trial court to determine if defendant gave consent upon consideration of evidence, including testimony that defendant asked whether officers had warrant which, if believed true by the finder of fact, might support inference that defendant did not consent to search but insisted that police must have warrant to search.). We note that in *Frank* there was also some evidence that the defendant initially agreed to a search but then once marijuana was located, he asked officers "where is your search warrant?" *Id.* at 203. So *Frank*'s objection or refusal followed initial apparent consent, in contrast to this case in which the defendant said something which could reasonably be construed as consent AFTER asking, "where's your warrant?"

16

we are unaware of any cases recognizing a refusal to consent through asking "where's your warrant" where such a question was quickly followed by words and behavior indicating assent — for example, the defendant simply stating "fine" or "well, okay" when presented with an officer's reasonable representation that a co-inhabitant had given consent to search, and the defendant then actively directing the police to contraband, as occurred here.

**E.  Any Consent Given or Retained by Payton Was Not Invalidated By Officer's Statement that Warrant Not Needed due to Wife's Consent.**

Not only do the facts indicate that Payton did not revoke consent or object to the search, but the facts do not demonstrate that his apparent consent (saying "fine" or "well, okay") was invalidly given in reliance on a "false claim" of his wife's consent.  As explained previously, a reasonable officer could have objectively construed Payton's wife's speech and behavior as indicating her voluntary consent to search.  Nor do we accept Payton's contention that the officer falsely informed him he had no right to refuse consent.  There is no evidence that the officer told Payton he had no right to refuse consent.  Actually, the evidence was that the officer told Payton that he did not need a warrant because of Payton's wife having already given consent and said nothing about whether Payton had a right to refuse consent.  The officer did not misrepresent the law in telling Payton no warrant was needed because of Sharon's consent.  Consent is a valid exception to the rule against warrantless

searches, and the officers had no duty to advise Payton of his right to refuse consent.[28]

Because the trial court properly determined that Sharon validly consented to a search of the residence and because Payton did not clearly revoke consent or object to a search, we agree with the Court of Appeals that the trial court properly denied the motion to suppress.

### III. CONCLUSION.

For the foregoing reasons, we affirm the Court of Appeals decision upholding the trial court's denial of the motion to suppress.

All sitting. Minton, C.J.; Abramson, Cunningham, Noble, Scott, and Venters, JJ., concur. Schroder, J., concurs, in part, and dissents, in part, by separate opinion.

SCHRODER, J., CONCURRING, IN PART, AND DISSENTING, IN PART: I concur with the majority in all but one area – the search of the bedroom. When Payton asked for the search warrant and was told that Sharon had already consented to the search, the officer's response created the false impression (even though no bad faith was alleged) that Payton could not revoke any prior consent, contrary to *Georgia v. Randolph.* Thus, I believe that Payton's subsequent response, "fine" or "well okay," could not be construed as consent and that his asking if the officer had a search warrant effectively revoked Sharon's earlier consent.

---

[28] *Cook,* 826 S.W.2d at 331.

18

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Joshua D. Farley
Assistant Attorney General
Attorney General's Office
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204