RENDERED: AUGUST 28, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-001282-MR

JEREMY DEREY LAWTON                      APPELLANT


                  APPEAL FROM FAYETTE CIRCUIT COURT
v.             HONORABLE ERNESTO M. SCORSONE, JUDGE
                   ACTION NO. 18-CR-00090


COMMONWEALTH OF KENTUCKY               APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: GOODWINE, K. THOMPSON, AND L. THOMPSON, JUDGES.

GOODWINE, JUDGE: Jeremy Derey Lawton[1] ("Lawton") entered a conditional

guilty plea on June 27, 2019, preserving the right to appeal from the Fayette

---

[1] The Notice of Appeal identifies appellant's first name as "Jermey." However, the briefs and record reflect that this is a typographical error and that his first name is actually "Jeremy." Therefore, this Opinion identifies appellant by the correct name.

Circuit Court's denial of his motion to suppress and judgment entered August 15, 2019. After careful review, we affirm.

On November 27, 2017, officers of the Lexington Police Department responded to a call that shots were fired on New Orleans Drive. Neighbors also informed the officers they heard what sounded like the crying of an injured dog and pointed officers in the direction of Lawton's residence. Lawton was standing outside the front of the residence when officers approached. He told officers the shots came from the rear of the house. Lawton's two-year-old child and fourteen-year-old stepson were still inside the home. Lawton initially denied officers consent to look inside the residence or look in the yard, claiming the property belonged to the mother of his eldest daughter.

Lawton stood outside the front door of the house for approximately thirty minutes. During that time, the two-year-old child came outside through the front door. When Lawton let the child back inside the home, Officer Donna Shepherd saw a trash bag on the floor near the door and a bottle of bleach on the kitchen counter. Lawton asked Officer Shepherd if he could go back inside the residence, and the officer asked if she could go inside with him. Lawton said "no," and the officer instructed him to remain outside. Lawton and Officer Shepherd continued talking, and she asked him if there was anything "on paper" that would

prohibit him from having a weapon, and Lawton admitted he was a three-time convicted felon.

Sergeant Gary Thurman then arrived at the scene and was informed by neighbors they heard what sounded like a dog "whelp" after shots were fired. Officer Shepherd told Sgt. Thurman that Lawton was a convicted felon, and she observed a trash bag and bleach bottle through the front door. Sgt. Thurman and Officer Shepherd spoke with Lawton again, and he gave conflicting stories about whether there were any dogs at the residence. Based on the information Sgt. Thurman received, he decided to seek a search warrant. He informed Lawton that he was applying for a search warrant and no one would be allowed to enter or leave the residence until the warrant was obtained. Sgt. Thurman contacted the Lexington Humane Society and requested they send officers to the residence.

Officer Shepherd's body camera recorded the following exchange:

Sgt. Thurman: So what's going to happen now is we're going to secure the premises, okay? And we're going to type up an affidavit for a search warrant and send it to a judge. We're not going to search for anything, um, until the judge says it's okay. But we are going to go in and secure it and nobody's going to be allowed to go in or out until we talk to the judge. Okay?

Lawton: I can step back in until then?

Sgt. Thurman: What's that?

-3-

Lawton:          I can step back in until then?

Both officers:  We're going to go with you.

Lawton:          You all going in with me?

Ofc. Shepherd: Yes, sir.

Lawton:          Okay.  Come on. [opens front door].

Lawton entered the front door and allowed the officers inside.  Within a minute of entering the residence, Lawton told Sgt. Thurman he wanted to show him something and requested Sgt. Thurman follow him to the back yard.  As a matter of officer safety, Officer Shepherd followed and stepped onto the back porch.  Her flashlight illuminated the area under the home, and she saw a mortally wounded pit bull.  The dog had been shot numerous times and was "bleeding out."  Sgt. Thurman attempted to administer first aid, but by the time the Humane Society officers arrived, the dog was dead.  Lawton was arrested immediately.  He then voluntarily led police to the location of firearms inside the house.

Lawton was charged with two counts of being a felon in possession of a handgun,[2] one count of torturing a dog/cat with serious physical injury or death,[3] and being a second-degree persistent felony offender.[4]  He filed a motion to

---

[2] Kentucky Revised Statutes (KRS) 527.040 (Class C felony).

[3] KRS 525.135(3) (Class D felony).

[4] KRS 532.080(2).

suppress the warrantless entry into the residence. The circuit court held a suppression hearing on May 2, 2018. Officer Shepherd and Sgt. Thurman testified for the Commonwealth. Officer Shepherd's body camera video was played into the record. Officer Shepherd testified that she was concerned about "blood and cleanup" due to the presence of the trash bag and bleach bottle combined with reports of shots fired and reports of a possibly injured dog. Lawton's admission that he was a convicted felon created further suspicion that weapons were inside the residence.

Sgt. Thurman testified Lawton gave conflicting stories regarding the whereabouts of two dogs. At first, Lawton said the dogs were at the residence, but when Sgt. Thurman asked Lawton to bring the dogs to the front door, he denied the dogs were there. Lawton told Sgt. Thurman he had dropped the dogs off at a friend's house. When Sgt. Thurman contacted the friend by phone, she told him the dogs were not at her house, and they were with Lawton. Lawton then told officers he took the dogs to her house while she was at work. Sgt. Thurman observed a person who was "fairly large in stature" inside the residence but claims he was unaware at the time that it was Lawton's fourteen-year-old stepson. According to Sgt. Thurman, he decided to seek a search warrant based on the following: (1) the report of shots fired, (2) Officer Shepherd's observation of the bleach bottle and trash bag, (3) Lawton's admission that he was a convicted felon,

(4) the presence of another person inside the house, and (5) the conflicting stories about whether there was a dog inside. However, because Lawton ultimately allowed officers to enter the home and voluntarily led them to critical evidence, no search warrant was ever obtained.

At the end of the suppression hearing, Lawton's counsel asked to brief the issue of the warrantless entry. The circuit court ruled out consent and narrowed the scope of briefing as follows:

> I don't think we need to argue with the issue of consent because given what they told this gentleman, I don't think it's an issue of consent. But I think we've got some, obviously, some concerns here that precipitated their action, so brief the issue of the protective sweep that was done, obviously, and on the facts that were considered.

The parties argued whether the warrantless entry was a lawful protective sweep accordingly.

The circuit court denied the motion to suppress by order entered July 11, 2018. Although the circuit court upheld the warrantless search, it avoided determining whether the entry was a valid protective sweep. Although the circuit court did not explain why it declined to rule on whether the entry was a protective sweep, it arguably did so because there was no in-home arrest prior to the entry as required by *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) and *Guzman v. Commonwealth*, 375 S.W.3d 805 (Ky. 2012). Instead, the

-6-

circuit court found that the emergency aid exception to the warrant requirement applied to the dog in this instance. The circuit court also found the warrantless search was valid to prevent the destruction of evidence.

On June 27, 2019, Lawton entered a conditional guilty plea to one count of being a convicted felon in possession of a handgun, one count of torturing a dog/cat with serious injury or death, being a first-degree persistent felony offender,[5] and first-degree bail jumping.[6] Lawton was sentenced to a total of eleven years of imprisonment. This appeal followed.

Lawton's sole issue on appeal stems from the circuit court's denial of his motion to suppress. "When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a *de novo* standard of review for conclusions of law." *Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006) (citing *Welch v. Commonwealth*, 149 S.W.3d 407, 409 (Ky. 2004)). Lawton argues the circuit court erred in finding the search was lawful by: (1) extending the emergency aid exception to pets and (2) finding the search was necessary to prevent the imminent destruction of evidence.

Although we agree with the circuit court's denial of Lawton's motion to suppress, we disagree with the court's reasoning. "Even if a lower court reaches

---

[5] KRS 532.080(3).

[6] KRS 520.070.

its judgment for the wrong reason, we may affirm a correct result upon any ground supported by the record." *Wells v. Commonwealth*, 512 S.W.3d 720, 721-22 (Ky. 2017) (citing *Commonwealth v. Fields*, 194 S.W.3d 255, 257 (Ky. 2006)). Despite the circuit court's contrary finding, for the following reason, we hold Lawton consented to police entry to the residence and then voluntarily led officers to the backyard. Thus, police lawfully entered the residence, and there was no search.

Consent to entry is distinguishable from consent to search. In *Piercy v. Commonwealth*, 303 S.W.3d 492 (Ky. App. 2010), officers initially searched Piercy's van and then asked if they could search his residence. *Id.* at 494. Piercy began walking toward his house to call his attorney because officers took his cellphone. *Id.* at 494-95. Piercy "left the door to his residence open and the officers followed him inside, assuming that they had permission to search the house. However, Detective Cooper testified that Piercy granted them permission to enter the house by saying 'that's fine.'" *Id.* at 495. Once inside, the officers could smell marijuana and asked Piercy to sign a consent to search form. *Id.* Piercy declined to sign the form, but he did not ask the officers to leave his residence. *Id.* Officers did not search the home until they obtained a search warrant. *Id.*

On appeal, this Court described the distinction between entering and searching. Piercy argued "he did not consent to the search of his residence and that any evidence obtained therein should be suppressed." *Id.* at 497. This Court pointed out that "Piercy uses the terms 'entry' and 'search' interchangeably in his brief." *Id.* There, "the activities constituting the search occurred after Detective Coomer obtained a search warrant. Piercy does not challenge the sufficiency of the search warrant and instead argues that he did not give the officers consent to enter his residence, where they immediately smelled marijuana." *Id.* This Court held Piercy gave consent for the officers to enter his residence through his nonverbal conduct and never attempted to deny or prevent their entry. *Id.* at 497-98.

In an unpublished opinion, *Whitworth v. Commonwealth*, No. 2019-CA-000568-MR, 2020 WL 1970599 (Ky. App. Apr. 24, 2020), this Court held the defendant's nonverbal conduct gave officers consent to enter the residence. *Id.* at *4. An officer knocked on the door and asked permission to speak with the owner of the residence. *Id.* at *5. The defendant, without hesitation, opened the door and moved aside. *Id.* This Court held the officers did not coerce or deceive the defendant to gain entry and made no show of power or force. *Id.*

To further demonstrate the difference between giving consent to search and consent to enter a residence, we examine *Payton v. Commonwealth*, 327 S.W.3d 468 (Ky. 2010). Below are the pertinent distinguishable facts of *Payton*:

> [T]here is no dispute that Sharon threw up her arms and said "come on in" in response to Secora and the officers' knock at the door and Secora's explaining to Sharon her (Secora's) purpose in being there. The only dispute concerns whether Deputy Blanton told Sharon he wanted to search the residence before Sharon said "come on in." Despite this dispute, Deputy Blanton's testimony that he told Sharon he would like to search is substantial evidence supporting the trial court's factual finding that Deputy Blanton requested Sharon's consent to search before Sharon said "come on in."

*Id.* at 472. The Supreme Court of Kentucky held the consent to search was valid based on the following reasoning:

> We are satisfied that the Court of Appeals properly recognized that even though "come on in" might normally connote permission to enter without necessarily granting permission to search, stating "come on in" in response to a request to enter and search without explicitly denying or restricting consent to search could reasonably be interpreted by the officer as offering permission to search.

*Id.* at 473.

Here, Sgt. Thurman informed Lawton that he and other officers were going to enter the residence to secure the premises and would apply for a warrant before searching the residence. Lawton then asked if he could go back inside the residence while waiting for a judge to issue a search warrant. Officers responded

-10-

they would go inside with him, and he said, "Okay. Come on." Lawton then opened the door and allowed officers to follow him inside the residence. Once inside, Lawton did not ask the officers to wait until a search warrant was obtained. Rather, Lawton invited Sgt. Thurman to the backyard where officers observed the dying dog.

The officers did not enter to secure the residence. Instead, they entered the residence because Lawton requested to go inside the residence and he consented to them accompanying him. The officers truthfully informed Lawton of their intent to secure the premises and obtain a warrant. Officers did not attempt to coerce or deceive Lawton to obtain his consent to search the residence. *Krause v. Commonwealth*, 206 S.W.3d 922, 924 (Ky. 2006). Lawton had the option to remain outside with officers until they secured a warrant to search the residence. We need not determine whether entry into the home to secure the premises would have been lawful because such an entry never occurred. Instead, Lawton consented to the officers' entry, so he could go back inside. Following entry, Lawton invited Sgt. Thurman to the backyard where officers found the injured dog in plain view. Because Lawton voluntarily extended the invitation for Sgt. Thurman to enter the backyard, with no provocation from the officers, there was no search.

Upon observation of the injured dog, officers arrested Lawton, and he voluntarily led officers to where he stored his firearms in the residence. The record does not indicate that officers requested to search for the weapons at that point. Once placed under physical arrest, an arrestee cannot voluntarily consent to a search. *Johns v. Commonwealth*, 394 S.W.2d 890, 892 (Ky. 1965). However, because the record does not indicate the officers requested to search for the firearms and Lawton volunteered their location, there was no search. Thus, we affirm the judgment of the circuit court because Lawton consented to officers' entry into the residence and then voluntarily showed officers the location of the dog and firearms.

Although the emergency aid exception does not apply under the circumstances, we commend the circuit court for extending that exception to the warrant requirement to the dog in this case. "The central purpose of the aptly named 'emergency aid' exception is to allow police officers to 'assist persons who are seriously injured or threatened with such injury.'" *Mundy v. Commonwealth*, 342 S.W.3d 878, 882-83 (Ky. App. 2011) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006)). In determining whether a warrantless search under the emergency aid exception is lawful, we examine "whether the police officer's entry into the [residence] was based on an objectively reasonable belief, given the information available at the

time of entry, that a person within the [residence] was in need of immediate aid."

*Id.* at 884 (footnote omitted).

Here, the record does not indicate that officers had a reasonable belief that the dog needed immediate aid. Based on review of Officer Shepherd's body camera video, the officers seemed to believe Lawton had "put down" the dog and was "cleaning up." They did not know there was a dog in need of aid until they observed her lying under the house. Under different circumstances, we would be inclined to extend the emergency aid exception to animals. Courts in other jurisdictions have extended this exception to render aid to animals in true emergency situations and further promote the public policy of the humane treatment of animals. *See Recchia v. City of Los Angeles Department of Animal Services*, 889 F.3d 553, 559 (9th Cir. 2018); *Commonwealth v. Duncan*, 7 N.E.3d 469 (Mass. 2014); *State v. Fessenden*, 310 P.3d 1163, 1167 (Or. Ct. App. 2013), *aff'd*, 333 P.3d 278 (Or. 2014); *People v. Chung*, 731, 110 Cal. Rptr. 3d 253, 260 (Cal. Ct. App. 2010); *see also State v. Glowney*, Nos. 27896 and 27897, 2019 WL 3986353 (Ohio Ct. App. Aug. 23, 2019). As Kentucky imposes criminal liability for torturing and abusing animals, we agree with the circuit court that extending the emergency aid exception to animals under the correct circumstances would further promote this Commonwealth's public policy against cruelty to animals. We find, however, that those circumstances were not present here.

-13-

For reasons other than those found by the circuit court, we affirm the judgment of the Fayette Circuit Court.

THOMPSON, L., JUDGE, CONCURS.

THOMPSON, K., JUDGE, DISSENTS WITHOUT OPINION.

BRIEFS FOR APPELLANT:

Robert C. Yang
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Mark D. Barry
Assistant Attorney General
Frankfort, Kentucky