RENDERED: MARCH 14, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0073-MR

LANCE BOWMAN                                                         APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ERIC J. HANER, JUDGE
NOS. 19-CR-003472 & 22-CR-002224

COMMONWEALTH OF KENTUCKY                                              APPELLEE

## OPINION OF THE COURT BY JUSTICE LAMBERT

## **AFFIRMING**

Lance Bowman was convicted of murder, tampering with physical evidence, and possession of a handgun by a convicted felon in relation to the shooting death of James Mentee, Jr. He was further found to be a first-degree persistent felony offender (PFO 1st) and was sentenced to fifty years' imprisonment. He now appeals his convictions and sentence as a matter of right. Ky. Const. § 110. After review, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

On December 19, 2019, at 11:38 pm Bowman walked into the front door of Retta's Lounge (Retta's), located on South 7th Street in Louisville. Retta's was described as a hookah lounge, a bar, and a restaurant, and was owned by Mentee. Of particular import, Retta's had interior and exterior security

cameras that captured the events leading up to and immediately following Mentee's death. One of the exterior cameras covered the front door and the concrete "porch" area just outside the front door, and another exterior camera covered a wide angle of the parking lot and a small sliver of the outer portion of the porch. Though the video footage from the cameras is high quality, it did not capture audio.

Roughly five minutes after Bowman entered Retta's, he was approached by Arthur Simpson, one of the security guards for the establishment. Simpson walked Bowman back outside onto the front porch area. When Bowman and Simpson first exited onto the porch, they appeared to have a somewhat tense conversation, but it never became physical. We note here that the footage clearly showed a pistol sticking out of Simpson's waistband. Soon after, Dwayne Hill got out of his car, walked onto the porch, and began talking to Bowman and Simpson. Again, it appears from the footage that Bowman was upset about something, but the three men seemingly talked calmly; they smiled and laughed and at one point Bowman even patted Simpson on his stomach in a playful way.

A few minutes later, a woman came out of the front door and sat on the open tailgate of a truck parked just in front of the porch. She and Bowman talked normally for a while, until the woman said something that apparently upset Bowman as she was walking back toward the front door. He got in her face in an aggressive manner, and Simpson put his hand on Bowman's shoulder to nudge him back. The woman then went back inside, and Bowman,

2

Simpson, and Hill continued to stand around and talk. Shortly thereafter, Mentee came outside. From the time Simpson escorted Bowman out of Retta's to the time Mentee came outside was approximately ten minutes.

When Mentee came outside, he shut the tailgate of the truck on which the unidentified woman had previously been sitting. He then walked back toward the front door and opened it. But before he could enter, Bowman said something to him, and he stopped. Mentee then said something in return that Bowman did not like based on his facial expression. Mentee remained standing in front of the door while Bowman then stepped toward him until the men were nearly chest to chest. The men then began talking while Simpson, Hill, and a third unidentified man stood close by.

At that point Mentee was saying something to Bowman, and Bowman appeared agitated. Simpson then stepped between Bowman and Mentee to get Bowman to back away. Simpson and the unidentified man then stood between Bowman and Mentee while Bowman continued saying something and pointing his finger at Mentee. All the while Mentee continued to stand in the same spot and respond; often his hands were palms up in front of him. Hill then moved to also stand near Bowman and over the next minute or so Bowman lightly jostled back and forth with Simpson, Hill, and the unidentified man. Bowman was very upset by this point, and he gestured his pistol over Simpson's shoulder in Mentee's direction at least once.

Bowman then walked away towards the parking lot and completely out of frame for a few seconds before charging back into frame with his pistol pointed

3

at Mentee's head.  Mentee grabbed the gun and pointed it down, the men began to struggle over it, and one shot was fired near Mentee's head while Bowman was still holding the gun, but it missed.  The men continued to grapple over the gun and went completely out of the camera's view.  Mentee was soon after shot in his upper left chest, but the shooting itself was not captured by any of the security cameras.  The bullet that struck Mentee traveled left to right, downward, and slightly back, and was consistent with being a .45 caliber G2 Research "R.I.P." (radically invasive projectile) round.  This is a unique bullet that has a solid copper base and a triangular shaped tip made of trocars that are designed to break off from the base and spread upon impact.  No weapon of any kind was found with Mentee's body and a subsequent toxicology screen determined he had no drugs of abuse or alcohol in his system.  Forensic testing of Bowman's gun concluded that the DNA of both Mentee and Bowman was on the trigger, grip, slide, sight, and barrel of the gun.

After Mentee was shot, the security camera overlooking the parking lot captured Bowman get up from the scuffle.  It appears he then struck Mentee's body with his gun and walked away, gun in hand.  Simpson then fired several .9mm rounds in Bowman's direction, and one struck his upper foot/ankle.[1] Bowman walked south on 7th Street for a short distance before crossing the

---

[1] Bowman claimed Simpson shot him while he was struggling over the gun with Mentee.  But, while the footage does show Simpson point his gun in the direction of the struggle, it is unclear whether he fired it at that time.  But the footage clearly shows him fire several rounds at Bowman as he walked away.

street onto Phyllis Avenue. While behind a residence on Phyllis Avenue he placed his gun between the home's HVAC unit and a stack of boards. Bowman then hid in the home's backyard until several law enforcement officers found him after responding to Retta's and following the blood trail left by the gunshot wound to his foot. After he was handcuffed and sent to the hospital, he was questioned by two different officers at different times. He told the first officer that the shooting was in self-defense, but two hours later he told a different officer that he was not at Retta's that night, that he did not have a gun, and that he knew nothing about the shooting.

At trial, Bowman testified in his own defense as follows. Bowman was born and raised in Louisville's west end, which in general is not a safe place. That is why he continued to carry a gun for self-protection notwithstanding his status as a convicted felon. From June to September 2019, he worked at Retta's as a security guard, but Mentee was not his boss. Rather, he worked for a man he called "Brooklyn" who would send his employees, including Bowman and Simpson, to different locations as needed. Bowman was fired from that position in September 2019 after an incident at Retta's during which he was jumped by two men. That night, Mentee asked Bowman to tell the two men to leave because of their disruptive behavior, and he did so. Rather than leave, the two men went to speak to Mentee; a conversation Bowman said he observed. Bowman claimed he heard Mentee say "yeah, go ahead, I don't care" to the men, and he was jumped by them shortly thereafter. Bowman did not know who the men were and never saw them again.

5

Two to three weeks after that incident, Brooklyn asked Bowman to call Mentee because Mentee wanted him to be a security guard at Retta's again. Bowman spoke to Mentee, and Bowman believed they were back on good terms based on that conversation.

On the night of the shooting, Bowman said Simpson escorted him to the porch area because Bowman had a gun. Ordinarily, a security guard would have checked him before he entered, but there was no one at the front door when he entered Retta's. He claimed he was not asked to leave the premises; he just could not be inside with a firearm. Bowman further claimed that he did not trust Simpson or Hill, he was not friends with them, and he believed Simpson was dangerous. When they first exited Retta's, he and Simpson were discussing an incident that occurred the last time Bowman was at Retta's during which Bowman prevented Simpson from being jumped. It is unclear exactly when that incident occurred, but it was after Bowman had been jumped at Retta's. Regarding Bowman getting in the unidentified woman's face on the night of the shooting, he claimed he did so because she told him she heard everyone from Louisville were "rats." Bowman testified the worst thing you can call someone in the west end is a "rat."

Bowman further explained that when Mentee came outside Bowman asked him if they "were cool" and Mentee said no because Bowman was disrespectful. Bowman said Mentee was referring to the night he prevented Simpson from being jumped. Bowman felt as though Mentee was "picking at him." After that, Bowman claimed that Simpson, Hill, and the third

6

unidentified male started to pull him away from Mentee and began threatening him. One of them told him, "You're going to make me lay you out out here" because Bowman was "acting tough." Mentee was also making threats and told Bowman he "would have the whole south side at [Bowman's] momma's house." Bowman claimed he was holding his gun in his hand because the three men kept trying to take it from him, but said he never pulled it out of his waistband.

Bowman then claimed Mentee told him he was the reason Bowman had been jumped previously and that if he ever came back to Retta's, it would happen again or worse. That was the point at which Bowman turned and began to walk away until he heard Mentee again say that he would have the whole south side at his mother's house and heard Mentee shout "get rid of him." At that point he got out his gun and charged Mentee because he was scared and wanted to ensure no one moved or did anything to hurt him. Bowman then claimed that after the shot was fired that missed Mentee, they continued to struggle over the gun and Bowman tripped. Bowman claimed that when he threw his hands out to catch himself, Mentee grabbed the gun out of Bowman's hand, and it went off; Bowman did not pull the trigger. Bowman said he then pushed Mentee's body off him, picked up his gun, and walked off as Simpson fired several shots at him. He maintained that Simpson came after him in a vehicle and that is why he hid behind the residence on Phyllis Avenue.

During cross-examination, Bowman acknowledged that Mentee never attempted to hit him or push him, and that he never saw a weapon on Mentee's person. He agreed that he was afraid of Mentee based solely on his verbal threats.

Based on the foregoing evidence, the jury was instructed on wanton and intentional murder, second-degree manslaughter, reckless homicide, and tampering with physical evidence. Regarding the murder, manslaughter, and reckless homicide instructions, the jury was further provided with both a self-protection instruction and an initial aggressor qualification to that instruction. The jury found Bowman to be guilty of murder and tampering with physical evidence. Subsequently, it found him to be guilty of possession of a handgun by a convicted felon and PFO 1st.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Bowman now raises several alleged issues before this Court. We address each in turn.

## A. The trial court did not err by denying Bowman's motion to suppress.

Bowman first asserts that the trial court erred by denying his motion to suppress all statements he made to law enforcement while at the hospital on the night of the shooting in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). For context, we reiterate that Bowman was taken directly from the home on Phyllis Avenue, where he was found and handcuffed by several police officers at gunpoint, to the hospital. It was undisputed that at least one police

officer remained with him at all times from Phyllis Avenue to the hospital and that he was always supervised by at least one officer thereafter. The questioning at issue occurred at two different times by two different officers, Detective Preston Eisenback (Det. Eisenback) and Detective Rickey Guffey (Det. Guffey), respectively, and was recorded on the officers' body cameras.

Det. Eisenback's body camera footage begins at 12:36 am. At that time, Bowman had just arrived at the emergency room, so the scene was somewhat chaotic. There were anywhere from five to ten people, most appear to be nurses, in the treatment area and all were either actively treating Bowman or standing nearby. Det. Eisenback waited several minutes for the commotion to die down and then asked a nurse if he could ask Bowman some questions. They then had the following exchange:

> **Eisenback:** Hey man, what happened? I'm a detective with Shively, I'm trying to figure out what happened.
>
> **Bowman:** Man I was just trying to defend myself.
>
> **Eisenback:** What's that?
>
> **Bowman:** I was just trying to defend myself.
>
> **Eisenback:** Defend yourself? From what?
>
> **Bowman:** Motherfuckers on that bullshit.
>
> **Eisenback:** Who's on the bullshit? Who was out there?
>
> **Bowman:** Whoever was on the bullshit like I don't know bruh.
>
> **Eisenback:** Well, I don't know either that's why I'm asking I'm trying to find out what's going on.
>
> **Bowman:** They found me shot but I don't know what's going on bruh.

9

**Eisenback:** You don't know who shot you?

**Bowman:** I'm just sitting here trying to get away from shit bruh.

**Eisenback:** You don't know who shot you?

**Bowman:** No I don't.

**Eisenback:** Do you have a weapon?

**Bowman:** No, did you find me with a weapon? Did they find me with a weapon?

**Eisenback:** I don't know, I'm just asking you that's all just relax.

**Bowman:** Did you find one on me?

**Eisenback:** I'm just asking you, just relax. I wasn't there you've got to fill in the details. If you're shot, I want to try to help you, I want to try to figure out what happened.

**Bowman:** Bruh listen I don't know what nobody was on bruh. All I know is I'm in pain.

**Eisenback:** Where were you at?

**Bowman:** That's all I know.

**Eisenback:** Where were you at?

**Bowman:** That's all I know.

**Eisenback:** You don't know where you were at when it happened?

**Bowman:** I'm in pain.

**Eisenback:** What's your name man?

At that point, Bowman stopped answering Det. Eisenback, and he walked away from his gurney. The foregoing excerpt was the only portion of Det. Eisenback's footage that was played during Bowman's trial.

At 1:04 am, a nurse rolled Bowman's gurney out of the treatment area and into an open area next to a row of private rooms. It appears he and some other patients were placed in that area because there were not enough private rooms. At 1:28 am, Bowman asked Det. Eisenback if he could go home, and he responded that he could not. When Bowman asked why, Det. Eisenback responded that he could lose his leg and that they had an investigation going on.

Det. Guffey, the lead detective on the case, arrived at 2:10 am. Around 2:19 am, Det. Guffey attempted to get Bowman to submit to a gunshot residue test several times, but Bowman refused. They then had the following exchange[2]:

> **Guffey:** I just want to make sure I'm recording this so that down the road I can show that I asked you several times to cooperate with swabs on your hands, I just want to make sure.
>
> **Bowman:** What do you need to swab my hands for?
>
> **Guffey:** For gunshot residue.
>
> **Bowman:** This what I'm sayin' bruh, I'm shot.
>
> **Guffey:** I understand but do you want to cooperate and let her swab your hands real quick so we can get her out of here and then you and I will talk?
>
> **Bowman:** What do we need to talk about?
>
> **Guffey:** We'll talk about—
>
> **Bowman:** Nah, why you can't talk to me right now?

---

[2] This portion of the footage was not played for the jury but was relevant to the trial court's ruling on Bowman's motion to suppress.

11

Det. Guffey then requested that Bowman submit to the testing one final time, and he refused.  Shortly thereafter, a nurse came to give Bowman some pain medication, and then Bowman and Guffey had the following exchange:

> **Bowman:** And when I take this don't ask me no questions bro leave me the fuck alone.  If anything like where's my family bro like I ain't had contact with nobody bruh.[3]
>
> **Guffey:** Once [the nurse] gets done I'll talk to you.
>
> **Bowman**: Don't try to talk to me when he get done. I don't got nothin' to talk about.
>
> **Guffey:**  Okay, let me tell you why I'm here.  There's a guy that's been killed at a bar that's on 7th Street, the guy—
>
> **Bowman:** And I'm shot.
>
> **Guffey:** Okay, listen, don't say anything just let me talk, alright?  I have you on video with a gun shooting at this individual okay?  So, I'm going to read you your rights, okay?  So, before you say anything let me read you your rights and then we'll talk okay?  You have the right to remain silent, do you understand that?[4]
>
> **Bowman:** For what though?
>
> **Guffey:** Do you understand you may remain silent?  I'm just asking you yes or no?  I'm reading you your rights.
>
> **Bowman:** But I'm shot.
>
> **Guffey:** I understand.  Do you understand you have the right to remain silent?
>
> **Bowman:** That's bullshit bro.

---

[3] We note that after Det. Eisenback's first round of questions excerpted above, he asked Bowman if there was anyone he could contact for him, but Bowman would not give him any contact information to do so.

[4] The portion of Det. Guffey's body camera footage that was played for the jury began with here with his statement, "You have the right to remain silent, do you understand that?"

**Guffey:** Anything you do say may be used against you in court and any other proceedings do you understand that?

**Bowman:** (does not answer)

**Guffey:** You have the right to consult an attorney before you make a statement or answer any questions, do you understand that?

**Bowman:** (does not answer)

**Guffey:** You may have your attorney—

**Bowman:** My thing is, is how—

**Guffey:** Can I read these to you? I really want to read these to you before you say anything okay? Because I want to make sure you know your rights before you start saying stuff okay? Can I finish these—

**Bowman:** But how are you just going to say I did something when I'm the one who's sitting here shot?

**Guffey:** You may have an attorney present during any questioning, do you understand that?

**Bowman:** (does not answer)

**Guffey:** You may request the court to appoint an attorney for you if you cannot afford to hire one, do you understand that?

**Bowman:** (does not answer)

**Guffey:** You may stop the questioning at any time by refusing to answer any further questions or by requesting to consult with an attorney. Do you understand your rights? Mr. Bowman? Do you understand them?

**Bowman:** (does not answer)

Det. Guffey finished reading Bowman his rights at approximately 2:25 am. He then asked if Bowman wanted to talk about what happened because there was security footage of Bowman shooting someone at Retta's. Bowman responded that he did not do it. Det. Guffey then said he knew Bowman told another

officer that it was self-defense, and that usually people that claim self-defense are cooperative and want to discuss what occurred. Bowman again said that he is the one who is shot, but he did not know who shot him. He also said that he was not at Retta's, that he was not fighting with anyone, that he does not know anything about a gun, and that he does not have "beef" with anyone. That was the substance of the clip that was played at trial, which ended at 2:58 am. At no point during this portion of the questioning, after Bowman is read his *Miranda* warnings, does he tell Det. Guffey he does not want to speak to him.

Before the trial court, Bowman's motion to suppress requested that all the statements he made to Dets. Eisenback and Guffey while at the hospital be suppressed. The Commonwealth conceded that the statements Bowman made after 1:28 am, when Det. Eisenback told him he could not go home, until approximately 2:25 am when Det. Guffey mirandized him should be suppressed. The trial court agreed with the Commonwealth's concession and found that any statements made by Bowman between 1:28 am and 2:25 am were inadmissible at trial.

However, the court went on to find that the statements Bowman made to Det. Eisenback prior to 1:28 am were admissible because he was not in custody. The court found that a reasonable person in his position would have believed he was free to leave, or, if he could not leave because of his medical condition, that he was free to stop answering questions, citing *Commonwealth*

14

*v. Lucas,* 195 S.W.3d 403 (Ky. 2006), and *Peacher v. Commonwealth,* 391

S.W.3d 821 (Ky. 2013).  The court reasoned that

> [t]he body camera footage shows Detective Eisenback questioned
> Mr. Bowman for a total of 11 minutes and 29 seconds.  Detective
> Eisenback was calm and asked general questions about what
> happened during the shooting, such as where Mr. Bowman was
> shot, who had shot him, and how he had been shot, without
> commanding him to answer.  Detective Eisenback's line of
> questioning does not suggest that he considered Mr. Bowman to be
> anything other than a victim or a witness in connection with the
> shooting.  Nor did Detective Eisenback exclude anyone from
> accessing the area where Mr. Bowman was recovering, preclude
> him from receiving medical treatment, or, prior to approximately
> 1:28 am, tell him that he could not leave.

The court further found that Bowman's statements to Det. Guffey made after

2:25 am were admissible because Bowman did not unequivocally invoke his

right to silence.  It found:

> With respect to Mr. Bowman's statements after 2:25 a.m., the body
> camera footage shows that, before Detective Guffey began his
> questioning, Mr. Bowman somewhat ambiguously told him at
> various points that he both would and would not talk to him.  At
> one point, Mr. Bowman even asked Detective Guffey, "why can't we
> talk right now?"  Detective Guffey then repeatedly told Mr.
> Bowman not to talk to him until after he had read his *Miranda*
> rights to him.  Contrary to Mr. Bowman's assertions, the Court
> cannot interpret his statements to Detective Guffey before he read
> his *Miranda* rights to him to be an unequivocal and unambiguous
> invocation of his right to remain silent that would have required
> Detective Guffey to cease all efforts to question him.

(Internal citations to the record omitted).

Bowman argues to this Court that the trial court erred in denying his

motion to suppress because: (1) Det. Eisenback subjected him to a custodial

interrogation without first advising him of his *Miranda* rights; and (2) Det.

Guffey ignored his unequivocal invocation of his right to remain silent.  This

15

Court's review of a trial court's ruling on a motion to suppress is two pronged. *See, e.g., Payton v. Commonwealth*, 327 S.W.3d 468, 471–72 (Ky. 2010). First, we determine whether the trial court's findings of fact are supported by substantial evidence. *Id.* at 471. "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *See, e.g., Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971). If the trial court's findings are supported by substantial evidence, they are considered conclusive. *Payton*, 327 S.W.3d at 471. "[W]e must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law." *Id.* at 471-72 (quoting *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002)). "In particular, '[t]he question of "custody" is reviewed de novo.'" *Peacher*, 391 S.W.3d at 846 (quoting *Alkabala-Sanchez v. Commonwealth* 255 S.W.3d 916-920(Ky. 2008)).

## 1) Bowman was not in custody for *Miranda* purposes when Det. Eisenback questioned him.

A fundamental tenet of our jurisprudence is that law enforcement must advise a suspect of their rights to remain silent and to the assistance of counsel prior to subjecting him or her to a custodial investigation. *Miranda*, 384 U.S. at 471-72. "Custody" is a term of art that was succinctly explained by this Court in *Peacher*:

> ["custody"] specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the

16

interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation.

Relevant circumstances include the place, time, and duration of the questioning; the questioning's tenor, whether cordial and neutral or harsh and accusatory; the individual's statements; the presence or absence of physical restraints; whether there was a threatening presence of several officers and a display of weapons or physical force; and the extent to which the questioner sought the individual's cooperation or otherwise informed him that he was not under arrest and was free to leave.

391 S.W.3d at 846 (cleaned up) (internal citations omitted).

With regard to police questioning that occurs while a suspect is a patient at a hospital, this Court has previously stated, albeit in unpublished opinions, that "the restraint giving rise to 'custody' must be restraint instigated by the police, and for that reason the majority rule is that confinement to a hospital bed does not, by itself, amount to 'custody' for *Miranda* purposes." *Griggs v. Commonwealth*, 2006-SC-000846-MR, 2008 WL 1851080, at *5 (Ky. Apr. 24, 2008) (citing *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (Ark. 1997); *DeJesus v. State*, 655 A.2d 1180 (Del.1995); *State v. Tucker*, 131 N.H. 526, 557 A.2d 270 (N.H. 1989); *People v. Milhollin*, 751 P.2d 43 (Colo. 1988)). *See also, Hardin v. Commonwealth*, 2015-SC-000614-MR, 2016 WL 7665872, at *2 (Ky. Dec. 15, 2016) (quoting *Griggs*, 2008 WL 1851080, at *6).[5] "Rather, hospital

___

[5] Although unpublished, the conclusion from *Griggs* and *Hardin* is consistent with published case law that provides, for example, that being questioned in a police station is not custody *per se*, *Peacher*, 391 S.W.3d at 848, nor is being questioned in a police vehicle, *Simpson v. Commonwealth*, 653 S.W.3d 855, 862 (Ky. 2022). Moreover, in *Haney v. Commonwealth*, 653 S.W.3d 559, 565-66 (Ky. 2022), we held that a

questioning, like questioning elsewhere, is not custodial unless the circumstances would lead a reasonable person to believe that were he capable of leaving the hospital, the police would not allow him to do so." *Griggs*, 2008 WL 1851080, at *5.

Based on the totality of the circumstances surrounding Det. Eisenback's questioning of Bowman, we agree with the trial court's determination that he was not in custody for *Miranda* purposes when he was questioned by Det. Eisenback. The questioning, which was relatively short, took place in a bustling emergency room treatment area while several nurses administered various means of medical treatment. At no point did Det. Eisenback attempt to clear the room or stop treatment so that he could question Bowman and, indeed, he waited until there was a lull in treatment before he began asking questions. The questions themselves were asked in a professional and non-accusatory manner and were predominantly concerned with trying to figure out what occurred (What happened? Who shot you? Where were you? Did you have a weapon? What is your name?). And although Bowman's answers were evasive, Det. Eisenback never commanded him to answer. Moreover, when Bowman stopped answering his questions, Det. Eisenback ceased asking them. Bowman was not handcuffed or otherwise restrained and, at that time, was not told that he was under arrest or that he could not leave.

---

suspect was not in custody for *Miranda* purposes when she was questioned by an officer in her hospital room.

Bowman points to several factors to support his argument that a reasonable person in his position would have believed he was in custody when questioned by Det. Eisenback. While we agree with his assertion that the fact that Det. Eisenback did not tell him he was free to leave or stop questioning is a factor that cuts in favor of finding he was in custody, custody is based on the totality of the circumstances and the remainder of his arguments are non-starters. First, Bowman contends that he was handcuffed and deemed a suspect when police first located him on Phyllis Avenue; that he was escorted by police to the hospital; that Det. Eisenback initiated contact with him because he matched the description of the suspect in Mentee's shooting; and that Det. Eisenback collected his clothing from him while in the emergency room. But, "[w]hat the police may know or suspect about the interviewee or even the fact that they intend to arrest him is irrelevant to [a custody] determination, unless they communicate their knowledge or intent in such a way that a reasonable person would believe himself effectively arrested." *Peacher*, 391 S.W.3d at 848 (citing *Yarborough v. Alvarado*, 541 U.S. 652 (2004)). As noted, nothing about Det. Eisenback's interaction with Bowman in the emergency room would have communicated such an intent to a reasonable person.

Bowman also argues that the questions posed to him by Det. Eisenback were attempts to get him to make incriminating statements. But even assuming arguendo we agree with his assertion that Det. Eisenback

19

interrogated him,[6] "*Miranda* does not forbid non-custodial interrogation."

*Peacher*, 391 S.W.3d at 847 (citing *Stansbury v. California*, 511 U.S. 318 (1994)). In other words, Det. Eisenback was free to ask Bowman potentially incriminating questions because Bowman was not in custody.

### 2) Det. Guffey did not ignore an unambiguous invocation of Bowman's right to remain silent.

Bowman next alleges that Det. Guffey ignored his unequivocal invocation of his right to remain silent. A suspect who wishes to invoke his or her right to remain silent under *Miranda* must do so unambiguously. *Bartley v. Commonwealth*, 445 S.W.3d 1, 5 (Ky. 2014) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74.

Here, Bowman points to the following statements to support his claim that Det. Guffey did not honor his invocation of his right to remain silent: "Don't ask me no questions," "leave me the fuck alone," "don't trying to talk to me," and "I don't have nothing to talk about." While there is no doubt that these statements occurred after he was in custody for *Miranda* purposes, based

---

[6] "The term [interrogation] under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Dunlap v. Commonwealth*, 435 S.W.3d 537, 598 (Ky. 2013), *abrogated on other grounds by Abbott, Inc. v. Guirguis*, 626 S.W.3d 475 (Ky. 2021).

20

on the excerpt above, each of them occurred before he was mirandized and before Det. Guffey began his formal interrogation.

This Court has previously held that "the Fifth Amendment rights protected by *Miranda* attach only after a defendant is taken into custody and subjected to interrogation. [And] [a]ny attempt to invoke those rights prior to custodial interrogation is premature and ineffective." *Wilson v. Commonwealth*, 199 S.W.3d 175, 179 (Ky. 2006). Stated differently, "[i]n order for Miranda rights to be invoked, there must be (1) custody and (2) interrogation." *United States v. Vega-Figueroa*, 234 F.3d 744, 749 (1st Cir. 2000). In *Wilson*, this Court held that a suspect could not prematurely invoke his rights to silence and counsel because he was not in custody when he attempted to invoke them. 199 S.W.3d at 180 ("Thus, we conclude that Appellant was not in custody when he attempted to invoke his Miranda rights to silence and counsel. For that reason Appellant's *Miranda* rights had not yet attached, and he could not at that time make a valid assertion of those rights.").

Here, Bowman was in custody when he made the statements he claims were an invocation of his right to remain silent, but just moments before Bowman had indicated his desire to speak to Det. Guffey by asking, "why you can't (sic) talk to me right now?" And, Det. Guffey specifically ensured that he did not ask Bowman any questions, i.e., begin his interrogation, until Bowman was advised of his rights. Given that an officer was required to remain with Bowman throughout his time at the hospital according to policy, mirandizing him was appropriate. In addition, while Det. Guffey was attempting to read

21

Bowman his rights, Bowman began trying to speak to him five different times. After Det. Guffey completed the recitation of the warnings, Bowman responded to his questions and did not again attempt to invoke his right to silence. We therefore hold that the trial court did not err by finding that the statements Bowman made to Det. Guffey after he was mirandized were admissible.[7]

Moreover, even if this Court were to conclude that Bowman's statements to Det. Guffey were admitted in violation of his rights under *Miranda*, the error was harmless beyond a reasonable doubt. *See Jones v. Commonwealth*, 641 S.W.3d 162, 172 (Ky. 2022) (citing *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n.1 (Ky. 2009)). The harmless beyond a reasonable doubt standard requires us to ask "whether, 'absent [the impermissible testimony], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?'" *Jones*, 641 S.W.3d at 172 (quoting *Baumia v. Commonwealth*, 402 S.W.3d 530, 539 (Ky. 2013)).

The footage of Det. Guffey speaking with Bowman at the hospital was but a nine-minute-long clip played within the context of a two-day trial with numerous witnesses. As noted, the substance of that clip was Bowman denying any involvement whatsoever with Mentee's shooting: he said he was not at Retta's, he did not have a gun, he was not fighting with anyone, etc.

---

[7] To clarify, nothing in this opinion shall be construed to hold that a suspect must first be mirandized in order to invoke his or her *Miranda* rights. As this Court previously said in *Green v. Commonwealth*, 815 S.W.2d 398, 400 (Ky. 1991), "[t]he giving of a *Miranda* warning does not suddenly endow a defendant with a new constitutional right. The right to remain silent exists whether or not the warning has been or is ever given. The warning is required not to activate the right secured, but to enable citizens to knowingly exercise or waive it."

But, because of the security footage, which was unquestionably admissible, he was required to change that story at trial. On the basis of that footage alone, and in the absence of the clip of Bowman's interview with Det. Guffey, a jury could have found Bowman guilty of murder. We therefore hold beyond a reasonable doubt that, had the clip of Bowman's interview with Det. Guffey not been played, Bowman still would have been found guilty, and any error in its admission would have been harmless.

**B. Det. Guffey improperly narrated the surveillance footage without personal knowledge of the events depicted, but the error was not palpable.**

Bowman's second assertion of error alleges that Det. Guffey improperly interpreted the surveillance video footage without personal knowledge of the events depicted in violation of KRE[8] 701 and KRE 602. Bowman acknowledges he failed to preserve this issue but has requested review for palpable error pursuant to RCr[9] 10.26.

> For an error to be palpable, it must be "easily perceptible, plain, obvious and readily noticeable." A palpable error "must involve prejudice more egregious than that occurring in reversible error[.]" A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis "boils down to" is whether the reviewing court believes there is a "substantial possibility" that the result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (footnotes omitted) (quoting *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997); *Ernst v.*

---

[8] Kentucky Rule of Evidence.

[9] Kentucky Rule of Criminal Procedure.

23

*Commonwealth* 160 S.W.3d 744, 758 (Ky. 2005); *Schoenbachler v.*

*Commonwealth* 95 S.W. 3d 830, 836 (Ky. 2003)).

Bowman specifically complains about the following two pieces of testimony. As the portion of the surveillance footage showing Simpson escorting Bowman back onto the porch was being played for the jury, the Commonwealth and Det. Guffey had the following exchange:

> **CW:**[10] Was there more security system than we're showing the jury today? I mean, was there hours of it that you had to go through?
>
> **Guffey:** There is more footage available, yes.
>
> **CW:** When you watched all the footage, including what we're showing the jury today, did you see anyone strike the defendant?
>
> **Guffey:** I did not.
>
> **CW:** Did you see anyone push the defendant?
>
> **Guffey:** No.
>
> **CW:** Did you see anyone get up in the defendant's face in any way in all the video that you watched?
>
> **Guffey:** I did not.
>
> **CW:** Did you see anyone point a gun at the defendant in any of the videos?
>
> **Guffey:** I did not.

We reiterate here that Bowman would later concede during cross-examination that Mentee never attempted to hit or push him.

---

[10] Commonwealth.

Later, after the footage depicted Simpson, Hill, and the unidentified man putting themselves between Mentee and Bowman while Bowman and Mentee were saying things back and forth to one another, there was a point at which Bowman was primarily arguing with Simpson, and Mentee was observing them and not saying anything for approximately one minute. At that point, the following exchange occurred:

> **CW:** Does the victim seem to be saying anything to anybody for the last two minutes?
>
> **Guffey:** No.

Bowman argues that this constituted an impermissible interpretation of the footage by Det. Guffey, and that it was a manifest reversible error under *Kimmel v. Commonwealth*, 671 S.W.3d 230 (Ky. 2023), and *Gordon v. Commonwealth*, 916 S.W.2d 176 (Ky. 1995). We disagree.

"KRE 602 and KRE 701 govern the admissibility of narrative testimony." *Kimmel*, 671 S.W.3d at 244. KRE 701, in relevant part, limits lay opinion testimony to opinions or inferences which are "[r]ationally based on the perception of the witness[.]" KRE 701(a). In addition, KRE 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

In *Gordon*, the defendant was convicted of trafficking in a controlled substance following a controlled drug buy for which law enforcement used a paid informant. 916 S.W.2d at 178. At trial, a substantially inaudible tape recording of the transaction was played for the jury after which the informant testified to his recollections regarding the salient portions of the conversation.

*Id.* at 179-80. The tape was then replayed, and the informant was asked what he said. *Id.* at 180. Based on the informant's response to that question, this Court concluded that "the witness purported to interpret the tape recording rather than testify from his recollection." *Id.* The *Gordon* Court held this was error and the Court directed that, upon retrial,[11] "[t]he court should refrain . . . from permitting the witness to interpret what is on the tape. It is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness." *Id.* (citing *Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky. 1988)).

In *Kimmel*, the defendant was observed shoplifting from Walmart by a loss prevention associate, Michael Knipp (Knipp). 671 S.W.3d at 233-34. During Knipp's testimony, the Commonwealth introduced four surveillance videos, and Knipp provided narrative testimony of what they depicted either just before or just after each clip. *Id.* at 243. Videos 1, 2, and 4, showed the defendant entering the store, selecting a phone charger from a shelf, and existing the store, respectively. *Id.* at 244. The *Kimmel* Court noted that "[t]hese actions are clearly depicted by the video, and Knipp's narration did not add to what jurors could view on the video themselves." *Id.* at 244-45. However, video 3, which Knipp testified depicted the defendant removing a doll from his cart, turning his back to the camera, and putting the doll in his

---

[11] The Court reversed and remanded on an unrelated issue.

waistband, was so low quality that it was difficult to ascertain where he was or what he was doing.  *Id.* at 245.  This Court held:

> The difficulty in observing [the defendant] in the video, paired with the uncertainty as to which of [the defendant's] actions Knipp personally observed, leads us to conclude that Knipp's narration as to Video 3 exceeded the bounds of KRE 602 and 701.  Because we cannot definitively conclude whether Knipp's testimony exceeded his personal knowledge of the events, this narration should not have been permitted.
>
> Nevertheless, we cannot say this error was palpable.  The jurors watched the video and "were in a position to interpret the security footage independently from the testimony."  Additionally, the evidence against Kimmel was substantial, making it difficult to conclude that the jury was improperly persuaded by Knipp's one-line testimony describing Kimmel's actions.  The error certainly was not palpable and so fundamental that it threatened the integrity of the judicial process.

*Id.* (citations omitted) (quoting *Boyd v. Commonwealth* 439 S.W.3d 126, 132 (Ky. 2014) (citing *Brewer v. Commonwealth* 206 S.W. 3d 343, 349 (Ky. 2006) and *Martin v. Commonwealth* 207 S.W.3d 1 (Ky. 2006)).

Here, Det. Guffey testified that: (1) in all the footage he reviewed he never saw anyone strike, push, get in the face of, or pull a gun on Bowman prior to the shooting; and (2) that at one point close in time to the shooting Mentee appeared to not say anything for a short period of time.  Concerning the first piece of testimony, we clarify that the security footage played for the jury depicted the entirety of the events of the evening of December 19 from the time Bowman arrived at Retta's until he walked away from Retta's following the shooting.  This Court is therefore unclear on what "other footage" the Commonwealth was referring to.  But, at any rate, Bowman has never raised a hearsay objection based on Det. Guffey or the Commonwealth referring to

27

evidence outside the record. The allegation of error Bowman raises is that Det. Guffey improperly testified that he never witnessed anyone strike, push, or otherwise threaten Bowman in the footage that was played for the jury, and that Mentee stopped speaking for a short period of time in the moments leading up to the shooting.

We agree that Det. Guffey could not properly narrate the footage in this manner because he lacked the requisite personal knowledge of those events, and therefore error occurred. However, we cannot agree that the error was palpable. As previously noted, the footage itself was very high quality—unlike the tape recording in *Gordon* and "video 3" in *Kimmel*—and the jurors would have been free to interpret the film independently from Det. Guffey's testimony. We accordingly cannot hold that, absent this portion of Det. Guffey's testimony, there "is a substantial possibility that the result in the case would have been different[.]" *Brewer*, 206 S.W.3d at 349.

## C. The trial court did not err by providing the jury with an initial aggressor limitation instruction.

Bowman next asserts that the trial court erred by providing the jury with an initial aggressor limitation to self-defense instruction. A trial judge must consider the totality of the circumstances surrounding an incident when deciding whether an instruction on self-defense with limitations is proper and must find as a matter of law that there is sufficient evidence to justify a limitation instruction before submitting it to the jury. *Conley v. Commonwealth*, 599 S.W.3d 756, 776 (Ky. 2019). We review a trial court's

28

ruling regarding jury instructions for abuse of discretion. *See, e.g., Daniel v. Commonwealth*, 607 S.W.3d 626, 643 (Ky. 2020). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

The initial aggressor limitation statute, KRS[12] 503.060 provides in pertinent part:

> Notwithstanding the provisions of KRS 503.050, the use of physical force by a defendant upon another person is not justifiable when:
>
> . . .
>
> (3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:
>
>> (a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury; or
>>
>> (b) He withdraws from the encounter and effectively communicates to the other person his intent to do so and the latter nevertheless continues or threatens the use of unlawful physical force.

The purpose of this limitation to self-defense is "to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Conley,* 599 S.W.3d at 775 (quoting *Hayes v. Commonwealth,* 2015-SC-0050-MR, 2017 WL 639387, at *4 (Ky. Feb 16,

---

[12] Kentucky Revised Statute.

29

2015)).  "The initial aggressor limitation is added to a self-protection instruction if: (1) the facts support a self-protection instruction; and (2) there are facts that would support a juror's belief that the defendant was the initial aggressor." *Sutton v. Commonwealth*, 627 S.W.3d 836, 853 (Ky. 2021).  For a defendant to qualify as an initial aggressor, he or she "must use physical force prior to any act of purported self-protection."  *Conley*, 599 S.W.3d at 776.  "Physical force" is defined as "force used upon **or directed toward** the body of another person and includes confinement."  KRS 503.010(4) (emphasis added).

Before the trial court, the Commonwealth asserted that a self-protection jury instruction was not warranted because Bowman testified that Mentee accidentally shot himself.  The trial court found that argument "interesting" but nonetheless rejected it based on its conclusion that, if the jury did believe Bowman pulled the trigger, it could then go on to decide whether it was done in self-defense, as the shooting occurring during a struggle.  Following that ruling, defense counsel objected to an initial aggressor limitation instruction being provided because, based on Bowman's testimony, Mentee was the initial aggressor and Bowman had attempted to remove himself from the situation by walking away but Mentee continued to threaten him.  The trial court rejected this argument based on its reasoning that Bowman's testimony versus the surveillance footage created a conflicting factual issue for the jury to decide.  The court further found that Bowman's act of pointing a gun at Mentee was sufficient to satisfy KRS Chapter 503's definition of "physical force" because it

30

constituted force "directed toward" the body of another, and therefore ruled that an initial aggressor limitation instruction was warranted.

Bowman argues to this Court that the trial court erred by finding that his act of pointing a gun at Mentee satisfied the definition of "physical force." From this Court's review, there are no published precedents that address whether the act of pointing a gun at someone constitutes force "directed toward the body of another person." KRS 503.010(4). But the unpublished cases of *Kingdon v. Commonwealth*, 2014-SC-000406-MR, 2016 WL 3387066 (Ky. June 16, 2016), and *Kidd v. Commonwealth*, 2020-SC-0433-MR, 2022 WL 2253588 (Ky. App. June 16, 2022), as well as common sense, support that conclusion.

In *Kingdon*, the defendant believed the victim had burglarized his apartment and stolen money from him. 2016 WL 3387066, at *1. He confronted the victim while on a city bus, and after a heated argument the defendant pulled out a gun and shot the victim in the head. *Id.* The defendant testified that he acted in self-defense because he saw the victim reach into his own pants and believed he was attempting to get his own gun. *Id.* On appeal to this Court, the defendant asserted that the trial court erred by providing the jury with an initial aggressor instruction. *Id.* at *5. The *Kingdon* Court disagreed and held that because "the jury heard testimony that [the defendant] pursued [the victim] by chasing and boarding the bus so that he could confront [the victim] with a loaded gun and recover money [the victim] stole[,]" there was sufficient evidence for the jury to reasonably find that the defendant was the initial aggressor. *Id.* at *6.

31

In *Kidd*, the defendant, believing the victim had stolen drugs and money from him earlier that day, confronted the victim by brandishing a gun for twelve seconds before shooting the victim in the chest at point blank range. 2022 WL 2253588, at *2. As in Bowman's case, there was clear surveillance footage of the incident. *Id.* at *1. The defendant argued before the Court of Appeals that the trial court erred by providing the jury with an initial aggressor limitation instruction because "brandishing [a] weapon does not meet the definition of physical force." *Id.* at *4. The *Kidd* Court disagreed and held that "a jury could view [the surveillance] video and believe it to be direct evidence of [the defendant] acting as the initial aggressor." *Id.* at *5.

In addition to *Kingdon* and *Kidd*, this Court concludes it would be patently absurd to hold that pointing a loaded firearm at someone's head at close range does not qualify as directing force towards the body of that person. Accordingly, at the very least, we cannot say that the trial court's conclusion was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

**D. The trial court erred in the manner it polled the jury, but the error was not palpable.**

The final assertion of error raised by Bowman is that the trial court polled the jury after each of his trial's three phases in a manner that violated RCr 9.88, and was reversible error under *Miles v. Commonwealth*, 256 S.W.3d 46 (Ky. App. 2008). While we agree that the trial court erred, we hold that the error was not palpable.

32

Following the initial guilt phase of trial, after the jury's verdict was read, Bowman requested that the jury be polled. The trial judge then addressed the jury by saying, "Alright ladies and gentlemen, I'm going to poll the jury. What that means, I'm going to ask each and every one of you if that was your verdict, so I'll start right up here, ma'am was that your verdict?" After the first juror answered "yes," the judge then asked "sir?" or "ma'am?" to each juror individually while gesturing towards them with his hand until he got to the final four jurors, to which he only gestured. Each juror verbally responded "yes."

Next, after the jury's verdict was read in the guilt phase for the charge of felon in possession of a firearm, Bowman again asked the trial judge to poll the jury. The judge addressed the jury stating, "Same thing we did before, one by one I'm going to ask if that's your verdict." This time the judge only gestured to each juror with his hand, and each juror verbally responded "yes" or "yeah."

Finally, after the jury's verdict was read for the sentencing phase of the trial, Bowman asked that the jury be polled. The trial judge stated, "Same as before, I'm going to poll the jury. I'm going to ask each of you if it was your verdict." The judge gestured and said "ma'am?" to the first juror, and then gestured towards each of the remaining jurors. Each juror again verbally responded "yes" or "yeah."

Bowman never objected to the manner in which the jury was polled, nor did he request that the trial judge specifically ask each juror "was that your verdict?" He now asserts before this Court that the way the jury was polled

33

was reversible error. We accordingly agree with the Commonwealth's assertion that this error is unpreserved. Nevertheless, Bowman has requested review for palpable error pursuant to RCr 10.26 and we will review under the palpable error standard cited in Section II(B) of this opinion.

RCr 9.88 directs that "[w]hen the verdict is announced, either party may require the jury to be polled, which is done by the clerk's or court's asking each juror if it is his or her verdict. If upon the poll, there is not unanimous concurrence, the verdict cannot be received."

> The right to poll the jury in criminal causes has in this state always been deemed an essential part of the right of trial by jury. It is guaranteed by both the constitution and the statute, and ought to be maintained and preserved by the courts as essential to the protection of the rights of the citizen.

*Temple v. Commonwealth*, 77 Ky. 769, 771 (1879); Ky. Const. § 11. An accused's right to poll the jury may be waived, *Carver v. Commonwealth*, 256 S.W.2d 375, 377 (Ky. 1953) (citing *Johnson v. Commonwealth*, 215 S.W.2d 838, 839 (Ky. 1948)), but waiver did not occur in the case now before us.

In *Miles*, the trial court polled the jury in a somewhat similar manner as the trial court in this case:

> the trial court did not "ask [each] juror" if this was his or her verdict. The court's method of polling the six jurors took exactly four seconds:

> > Court: [Visually scanning the jury as a whole] Is that the verdict of the jury?

> > [looking at one juror] That your verdict?

> > [looking at a second juror] Your verdict ma'am?

> > [looking at a third juror] Sir?

34

256 S.W3d at 46-47. After the court asked the foregoing four questions to the jury, the defendant asked the trial court to "properly poll the jury[,]" to which the court replied, "I just did[.]" *Id.* at 47. The Court of Appeals held that the trial court's failure to ask each juror individually about the verdict deprived the defendant of his right under RCr 9.88 to have the jurors polled individually, necessitating reversal. *Id.*

We therefore agree with Bowman's contention that the trial court erred in the manner it polled the jury after each phase of his trifurcated trial. Nevertheless, this Court cannot say that it resulted in manifest injustice or that there "is a 'substantial possibility' that the result in the case would have been different[.]" *Brewer*, 206 S.W.3d at 349. To do so, we would have to believe that there is a substantial possibility that one or more jurors would have changed their answer from "yes" to "no" if the trial court had asked "was that your verdict" instead of stating that it was going to poll the jury, explaining what that meant, and then gesturing to each individual juror to elicit a response. We therefore affirm.

### III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

35

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Louisville Metro Public Defender


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Solicitor General