RENDERED: MAY 31, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1062-MR

COMMONWEALTH OF KENTUCKY                                             APPELLANT

v.
APPEAL FROM LETCHER CIRCUIT COURT
HONORABLE JAMES W. CRAFT, II, JUDGE
ACTION NO. 18-CR-00521

SHELLY DAMRON                                                              APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, CETRULO, AND ECKERLE, JUDGES.

ECKERLE, JUDGE: Appellant, the Commonwealth of Kentucky (the

"Commonwealth") filed this interlocutory appeal from an order of the Letcher

Circuit Court granting the motion of Appellee, Shelly Damron ("Damron"), to

suppress the results of a blood alcohol test. We reverse and remand.

## I.  Relevant Factual and Procedural History

In May 2018, Damron was involved in a two-vehicle crash, in which she was uninjured, but which resulted in injuries to the driver of the other vehicle, Craig Carter ("Carter") and the death of his passenger, who was Carter's son.  At the scene of the collision, Carter told Kentucky State Police Trooper Michael Burton ("Burton") that the other car had crossed over the line and hit him.  The position of the vehicles at the scene showed that the southbound car had crossed that line, entered the northbound lane, and hit the northbound vehicle.  Due to the understandable confusion, trauma, and emotions at the scene, officers initially and erroneously believed that Carter had driven the southbound car.

Another trooper told Burton that a beer can, which was still cool to the touch, had been found at the scene, although it was unclear which party had been drinking.  As Burton then believed that Damron was not at fault, and because he then did not know that it was Damron who had been drinking, he had no reason to believe criminal charges would be filed against her.  Accordingly, he did not give Damron an implied-consent warning, which would have informed her that a blood draw was mandatory and that a refusal would have resulted in penalties.  Instead, he merely asked Damron if she would agree to have her blood drawn at a hospital, telling her that it was the department's policy to give blood tests to all parties in such a collision.  She agreed, but said she did not wish to be transported by

ambulance and needed no medical care. As her boyfriend had then arrived on scene, Burton allowed her to ride with him to the hospital. Damron was not under arrest, and she did not appear intoxicated or injured. To ensure that Damron proceeded directly to the hospital and to obtain a timeline of events in the death investigation, Burton asked Constable Luther Tackett to escort the vehicle, which followed him to the hospital.

Once there, a second Kentucky State Police Trooper, Bruce Kelly ("Kelly"), discussed Kentucky's implied-consent laws with Damron. Although he did not tell her that a blood draw was mandatory, he detailed the penalties that she would face if she refused. Like Burton, Kelly said that department policy required a draw in a case involving a fatality. At a subsequent suppression hearing, Kelly testified that, prior to the blood draw, he read a card detailing the implied-consent laws to Damron, after which she again agreed to have her blood drawn. Both troopers testified that Damron was not placed under arrest prior to the blood draw.

For her part, Damron did not inform Kelly that Burton had previously told her that it was their policy to obtain the draw. She continued in her consent, never withdrew it, and did not object. The draw resulted in a blood alcohol finding of intoxication at <133g. On October 4, 2018, a Letcher County grand jury indicted her for the criminal charges of Manslaughter in the Second Degree, Assault in the Second Degree, Driving Under the Influence of an Intoxicant, First

-3-

Offense with Aggravating Circumstances, Criminal Mischief in the First Degree, Reckless Driving, and Speeding. On September 6, 2022, Damron filed a motion to suppress. On January 26, 2023, the Trial Court held an evidentiary hearing. On August 15, 2023, the Trial Court issued an Order of suppression. The Commonwealth appeals this interlocutory Order.

The main issue in this case revolves around whether the discussion of the implied-consent laws means Damron's consent to the blood draw was improperly coerced. Under Kentucky law, a person operating a motor vehicle is deemed to have "**given his or her consent to one (1) or more tests of his or her blood, breath, and urine, or combination thereof, for the purpose of determining alcohol concentration or presence of a substance which may impair one's driving ability**, if an officer has reasonable grounds to believe that a violation of [Kentucky Revised Statute] KRS 189A.010(1) or 189.520(1) [(pertaining to operating a vehicle which is not a motor vehicle)] has occurred." *Commonwealth v. McCarthy*, 628 S.W.3d 18, 28 (Ky. 2021) (quoting KRS 189A.103(1)) (emphasis, parentheses, and brackets original to *McCarthy*).

At the time of the incident in this case, KRS 189A.105(2)(a) provided in relevant part that a refusal to agree to blood testing may be used against the person in court, and if the person "is subsequently convicted of violating KRS 189A.010(1) then [s]he will be subject to a mandatory minimum jail sentence

-4-

which is twice as long as the mandatory minimum jail sentence imposed if [s]he submits to the tests . . . ." *See* 2015 Kentucky Laws Ch. 124 (SB 133).[1] The law in Kentucky regarding implied-consent and investigations of driving under the influence of an intoxicant ("DUI") markedly changed during the pendency of this case via *McCarthy*, 628 S.W.3d 18.

In 2016, before Damron allegedly killed someone while drunk, the United States Supreme Court held that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Birchfield v. North Dakota*, 579 U.S. 438, 477, 136 S. Ct. 2160, 2186, 195 L. Ed.

---

[1] The Legislature has subsequently amended KRS 189A.105 several times. It now provides in relevant part:

> (2) (a) At the time a breath, blood, or urine test is requested, the person shall be informed:
>
>> 1. That, if the person refuses to submit to such tests:
>>
>>> a. The fact of this refusal may be used against him or her in court as evidence of violating KRS 189A.010 and will result in suspension of his or her driver's license by the court at the time of arraignment; and
>>>
>>> b. Is subsequently convicted of violating KRS 189A.010(1):
>>>
>>>> i.  For a second or third time within a ten (10) year period, he or she will be subject to a mandatory minimum jail sentence which is twice as long as the mandatory minimum jail sentence imposed if he or she submits to the tests; and
>>>>
>>>> ii. His or her license will be suspended by the Transportation Cabinet . . . .

-5-

2d 560 (2016). However, this Court deemed that holding inapplicable in Kentucky because our implied-consent laws do not create a separate criminal offense when a person refuses to consent to blood testing. *Commonwealth v. Brown*, 560 S.W.3d 873, 878 (Ky. App. 2018).

The Kentucky Supreme Court in *McCarthy* rejected *Brown*'s reasoning (though it did not explicitly overrule *Brown*) and instead applied *Birchfield* to Kentucky's implied-consent schematic. It held that "the [United States] Supreme Court spoke in terms of 'criminal penalties' in *Birchfield*, and a criminal penalty imposed after conviction for DUI is no less a penalty than one imposed by a freestanding criminal statute." *McCarthy*, 628 S.W.3d at 34. According to the Kentucky Supreme Court, "[t]he mandatory additional jail time imposed in KRS 189A.105 following conviction for DUI is an unauthorized criminal penalty . . . . Or said another way, . . . because of the refusal, the defendant is subject to a criminal penalty that would not apply otherwise, and that result is not allowed under *Birchfield*." *Id*. at 32-33. In sum, that Court concluded that Kentucky's "implied consent statutory scheme" was "coercive"; and, thus, *Birchfield* "requires a warrant for a blood draw unless exigent circumstances exist or valid consent is given for the blood draw." *Haney v. Commonwealth*, 653 S.W.3d 559, 567 (Ky. 2022).

Here, citing *McCarthy*, Damron filed a motion to suppress the results of her blood draw. As foundation for her motion, she appears to complain that Kelly coerced her consent at the hospital by telling her of the department's policy and discussing the penalties she would face if she refused to allow the draw; but at the same time, she maintains that all officers improperly failed to read her the implied-consent warning. During the January 2023 suppression hearing, multiple police officers testified; Damron did not.[2] The crux of the undisputed testimony was that, at the collision site, Burton informed Damron that the State Police had a policy of testing the blood of drivers involved in fatal collisions.[3] Burton testified

---

[2] Damron submitted what purports to be an affidavit with her motion to suppress, stating in relevant part that "[p]rior to my blood draw, none of the law enforcement officers . . . read me the implied consent warning . . . ." Record ("R.") at 277. That attempted assertion under oath without testifying conflicts with Kelly's testimony at the suppression hearing, and it seems to undercut Damron's reliance upon *McCarthy*. The ostensible affidavit was not even notarized. However, at the suppression hearing, the Trial Court accepted it into the record under the substantial compliance doctrine, even though it was not subject to cross-examination. And yet, at the hearing, the Trial Court declined to accept into evidence a later, notarized affidavit because it was not submitted alongside the motion to suppress.

Ultimately, the Trial Court seemed to place no weight on the document, as it did not cite it in its decision. In fact, that Court implicitly rejected its statements by finding that Kelly "read his implied consent card to the Defendant prior to having her blood drawn." R. at 396.

Our conclusion is not changed by these unusual circumstances. The Trial Court's finding that Kelly discussed the implied-consent laws with Damron is amply supported by his testimony. Moreover, if he did not discuss the implied-consent laws with Damron, then he could not logically have coerced her to agree to the blood draw.

[3] Although not in the record before us, the Kentucky Supreme Court has quoted Kentucky State Police General Order OM-E-1, Section F as providing:

that he did not tell Damron that it was mandatory for her to have her blood drawn or that there would be penalties imposed upon her if she declined to consent. Burton testified that Damron freely consented to go to the hospital to have her blood drawn.

In August 2023, roughly seven months after the suppression hearing, the Trial Court issued an order granting Damron's motion to suppress. The Commonwealth then filed this appeal. *Parker v. Commonwealth*, 440 S.W.3d 381, 383 (Ky. 2014) (noting that suppression orders are "interlocutory, not final," but nonetheless "are appealable").

---

1. When a collision involves a fatality or there exists the possibility of a driver being charged with a felony as a result of the collision, the investigating officer shall request alcohol/drug testing of all involved drivers.

    a. If an operator is deceased, the investigating officer shall make the request known to the coroner before removal of the body from the scene, as well as requesting a full autopsy be performed.

    b. If the investigating officer suspects that any operator is under the influence of any illegal substance and the operator refuses the request of blood or urine testing, the officer shall immediately petition the court for a search warrant.

*Simpson v. Commonwealth*, 653 S.W.3d 855, 861 n.6 (Ky. 2022). It then held that this policy "adheres to the legislative directive as set forth in KRS 189A.105(2)(b)." *Id.* at 864. It continued that KRS 189A.105(2)(b) "addresses situations when officers lack immediate suspicion of a violation of the DUI statutes and explicitly states, 'if the incident involves a motor vehicle accident in which there was a fatality, the investigating peace officer shall seek such a search warrant for blood testing **unless the testing has already been done by consent**.'" *Id.* (emphasis added by *Simpson*).

## II. Analysis

A blood draw is a search. *Birchfield*, 579 U.S. at 455, 136 S. Ct. at 2173. "It is well-established under both Kentucky and U.S. Supreme Court jurisprudence that all searches without a valid search warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant." *Commonwealth v. Bembury*, 677 S.W.3d 385, 392 (Ky. 2023) (internal quotation marks and citations omitted). It is uncontested here that the authorities did not obtain, or even seek, a search warrant allowing them to draw Damron's blood. However, consent is a long-recognized and still-existing exception to the search warrant requirement. *McCarthy*, 628 S.W.3d at 29. Consent is only valid if it is freely given – *i.e.*, not procured via coercion. *Krause v. Commonwealth*, 206 S.W.3d 922, 924 (Ky. 2006). Therefore, we must determine whether Damron's repeated consent to Burton and then to Kelly was the product of coercion.

Our Supreme Court has outlined our standard of review as follows:

> While it is fundamental that a consent must be free, voluntary, and without coercion, it is also the case that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047-48, 36 L. Ed. 2d 854 (1973). Questions of fact are subject to review only for clear error, the most deferential

-9-

standard of review. *Miller v. Eldridge,* 146 S.W.3d 909, 915 (Ky. 2004).

*Hampton v. Commonwealth*, 231 S.W.3d 740, 749 (Ky. 2007).[4]

We employ a two-step approach to reviewing a Trial Court's ruling on a motion to suppress. We first review findings of fact under the clearly erroneous standard, which means that we may not disturb findings supported by substantial evidence. *Whitlow v. Commonwealth*, 575 S.W.3d 663, 668 (Ky. 2019). Second, we conduct a *de novo* review of the Trial Court's application of the law to the facts. *Id.*

We agree with the Commonwealth that the most pertinent factor here is one that the Trial Court essentially ignored. Specifically, the Trial Court did not meaningfully discuss Burton's testimony that Damron freely consented to go to the hospital to have her blood drawn at the scene of the accident. Likewise, the Trial Court did not discuss Burton's testimony that he did not advise Damron of Kentucky's implied-consent schematic, as she was neither in custody nor even a suspect in a crime. On that point, Burton's testimony is uncontradicted as Damron

---

[4] *But see Payton v. Commonwealth*, 327 S.W.3d 468, 473 n.9 (Ky. 2010) (holding that determining whether a person consented to a search "to some degree may involve an application of law to the facts," a type of decision which is reviewed *de novo* by an appellate court). The result in the case at hand is the same, regardless of whether we review for clear error or *de novo*.

did not testify at the hearing, and her purported affidavit states that the implied-consent laws were never discussed prior to the blood draw.

Burton also testified unequivocally that he did not tell Damron that it was mandatory for her to have her blood drawn; instead, he testified that he told her (accurately) that it was a policy of the Kentucky State Police to have blood drawn from drivers involved in collisions that resulted in a fatality. At that time, Damron was not a suspect. Damron had not been arrested. Damron was not restrained in handcuffs. Damron was not placed in a police vehicle. Damron was not taken to a police station. Damron was not read her *Miranda*[5] rights. Burton did not draw his weapon. Burton did not orally browbeat Damron into consenting. Damron was not surrounded by uniformed, armed law enforcement officers engaging in a show of force designed to obtain her compliance. And Damron did not receive (at least at this point) an implied-consent warning. Once the Commonwealth establishes that the defendant gave express consent to the taking of a blood sample, the Commonwealth need only show by a preponderance of the evidence that the consent given was freely and voluntarily obtained without any threat or express or implied coercion. *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky. 1992). In short, there is absolutely no evidence to indicate that Damron's consent was obtained by Burton via any coercion whatsoever, let alone sufficient

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

evidence to support any contrary finding by the Trial Court, although, again, it appears none was made.

Turning to the next, sequential question, we must determine whether the initial and otherwise free and voluntary consent somehow transformed into consent obtained by coercion once Kelly discussed Kentucky's implied-consent laws with Damron at the hospital. After all, since the blood draw did not occur immediately after Damron consented, there was an interval in which Damron could have withdrawn her consent or the voluntariness of her consent could have been otherwise superseded by other acts taken by law enforcement.

Damron stresses, as did the Trial Court, that she was escorted to the hospital by a uniformed constable (albeit one driving a separate vehicle) and was instantly met at the hospital by Kelly, who informed her of the negative consequences of declining to allow her blood to be drawn. Thus, in the view of Damron and the Trial Court, both of whom ignore her initial voluntary consent, her continued consent was somehow coerced. Damron's argument is not facially without merit as our Supreme Court believes Kentucky's implied-consent laws to be "coercive . . . ." *Haney*, 653 S.W.3d at 567.

However, consent is based on examining the totality of the circumstances, and these circumstances unequivocally show that Damron had already consented. Moreover, a hospital escort has no meaningful impact here.

-12-

Damron herself freely and voluntarily declined transport by an ambulance that did not contain law enforcement officers and coercive warnings. As she was not a suspect and not under arrest, she was free from transport in a police vehicle. Damron had already voluntarily consented to the blood draw, and there is no indication that the constable discussed Kentucky's implied-consent schematic with her or took any other actions (such as browbeating her or drawing his weapon) to call the voluntariness of her continuing consent into question. Similarly, Kelly's meeting with Damron at the hospital, by itself, has no direct bearing on the voluntariness of her previously-given consent. There was no police misconduct here.

Instead, determining whether the consent to search here was coerced is chiefly dependent upon the impact of Kelly reading a card summarizing Kentucky's implied-consent laws to Damron at the hospital after she had already consented to a blood draw for purposes of determining her blood alcohol level. The parties have not cited, nor have we independently located, precedent addressing that issue.

The logic underlying *Birchfield* and *McCarthy* is that consent predicated on wishing to avoid increased criminal penalties for refusing consent is improper consent based on coercion. As stated above, the United States Supreme Court held that "motorists cannot be deemed to have consented to submit to a

blood test on pain of committing a criminal offense." *Birchfield*, 579 U.S. at 477, 136 S. Ct. at 2186. Our Supreme Court took an expansive view of that principle in *McCarthy*, holding that "*Birchfield*'s guidance is not limited to statutes which create separate criminal charges for refusal alone. The mandatory additional jail time imposed in KRS 189A.105 following conviction for DUI is an unauthorized criminal penalty . . . ." *McCarthy*, 628 S.W.3d at 32.

Here, Damron's consent was not initially obtained "on pain of committing a criminal offense" or to avoid "mandatory additional jail time" because Damron consented prior to any discussion of such negative consequences, prior to being a suspect of "committing a criminal offense," and prior to facing any jail time, let alone "mandatory additional jail time." We do not construe *Birchfield* or *McCarthy* to hold that any coercive impact of implied-consent laws invariably taints and supersedes a pre-existing, valid consent that was freely given prior to any discussion of the negative consequences found in our implied-consent laws. In other words, a subsequent reading of an implied-consent warning does not serve automatically to invalidate a valid, prior consent that has not been and is not later withdrawn. Neither the Trial Court nor Damron cite to any authority so holding. We instead construe precedent as holding only that consent initially obtained to avoid mandatory additional jail time was obtained by coercion.

Of course, a person who wishes to withdraw her prior consent to a blood draw after being informed of our implied-consent laws may do so. But she must take affirmative steps to effectuate that withdrawal. Here, Damron took no discernible steps whatsoever to withdraw her consent after Kelly discussed Kentucky's implied-consent laws. Kentucky law requires a person who wishes to withdraw her consent to a search to take "clear acts of revocation" that "obviously or clearly indicat[e] withdrawal of consent . . . ." *Payton*, 327 S.W.3d at 477, n.22. Here, Damron points to **nothing** she said or did at the hospital or before the hospital to indicate that she wished to withdraw her consent to the blood draw. Silent acquiescence is not a clear act of revocation. Thus, Damron did not withdraw her consent after hearing Kelly discussing Kentucky's implied-consent laws, and the Trial Court never made a factual finding that she did. Any finding that she withdrew her consent would have been clearly erroneous because no evidence exists, let alone substantial evidence, to support such a finding. In sum, taking all of these unique and undisputed facts and circumstances into account, and applying those facts to the law under a *de novo* standard of review, we conclude that Damron validly and legally consented to having her blood drawn.

Lest this Opinion be misconstrued, we shall recap the essential tenets of our holding. A blood draw is a search. A person has a constitutional right to refuse to consent to a search by the authorities. A search must be done pursuant to

-15-

a warrant unless a valid exception to the warrant requirement is present. Consent is a valid exception, but consent obtained as a result of coercion is invalid. Kentucky's Supreme Court has deemed the implied-consent law to be coercive. Thus, consent stemming from, and first received after, a discussion of those laws is generally deemed to have been obtained via coercion.

However, a discussion of the implied-consent laws does not automatically transform a valid, prior consent to search into an invalid consent obtained as a result of coercion. Instead, a person who wishes to withdraw her valid consent after the authorities discuss the implied-consent laws may do so, but she must take clear steps to make plain an intent to withdraw consent. Taking into account all the facts and circumstances, Damron gave prior consent untainted by any discussion of the implied-consent schematic and did nothing to indicate she wished to withdraw that consent after later being informed of Kentucky's implied-consent laws. Therefore, her consent remained effective and non-coerced, and the authorities permissibly drew her blood without first obtaining a warrant.

Finally, our conclusion differs from that reached by the Trial Court. However, this area of the law has recently undergone seismic changes, and the Trial Court was faced with a novel fact pattern that does not align with facts found in recent precedent. We also commend that Court for patiently and courteously

presiding over a lengthy suppression hearing despite the attorneys for the Commonwealth and Damron at times becoming querulous.

### III.  Conclusion

For the foregoing reasons, the decision of the Letcher Circuit Court granting Shelly Damron's motion to suppress is reversed, and this matter is remanded for further proceedings on the charges against Damron.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Stephen W. Owens
Pikeville, Kentucky